[No. C030093. Third Dist. Mar. 29, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS JOHN SMITHSON, Defendant and Appellant.

[No. C030715. Third Dist. Mar. 29, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES FRANK SPENCE, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, IV, V and VI of the Spence Appeal, and parts I, II, III and IV of the Smithson Appeal.

## COUNSEL

Stephen Temko and Victor J. Morse for Defendants and Appellants.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Stephen G. Herndon, J. Robert Jibson, Rachelle A. Newcomb and John A. O'Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NICHOLSON, J.**—These appeals arise from the convictions of defendants Charles Frank Spence (Spence) and Thomas John Smithson (Smithson) for the robbery and murder of Dominick Virgil Tonelli (Tonelli or the victim).

We consolidated the appeals on our own motion. Spence alleges: (1) the trial court improperly refused to conduct a full hearing on Spence's motion to exclude his confession from evidence; (2) the trial court erroneously determined Spence had voluntarily waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*); (3) the trial court improperly instructed the jury on the crime of felony murder; (4) there was insufficient evidence to support Spence's conviction of first degree murder; (5) there was insufficient evidence to support the jury's special circumstance finding; and (6) the trial court imposed an unconstitutionally cruel and unusual sentence on Spence.

We reject each of these claims and affirm the judgment against Spence. The published portion of our opinion on Spence's appeal presents our analysis of Spence's first and third grounds for appeal.

Smithson alleges: (1) the evidence was insufficient to support the attempted robbery conviction; (2) the evidence was insufficient to support the special circumstance finding; (3) the trial court erroneously denied Smithson's request to "sanitize" the reading of the information to the jury so as to remove all references to a prior felony conviction; and (4) Smithson's trial counsel rendered ineffective assistance by failing to move to sever the count under Penal Code section 12021 from the remaining counts. (All statutory references are to the Penal Code unless otherwise noted.) In their opposition to Smithson's appeal, the People claim the trial court imposed an unauthorized sentence by failing to double the term of Smithson's life-without-parole sentence pursuant to subdivision (e)(1) of section 667. We reject the claims of both Smithson and the People and affirm the judgment against Smithson in its entirety. The published portion of Smithson's appeal presents our analysis on the People's challenge to Smithson's sentence.

PROCEDURE

The case against both defendants was prosecuted in a single trial but before dual juries. On June 4, 1998, one jury convicted Spence of first degree murder (§ 187, subd. (a)) and second degree robbery (§ 211). The jury found the existence of a special circumstance in that Spence committed the murder in furtherance of the robbery (§ 190.2, subd. (a)(17)), and found that a principal in the felony was armed with a firearm (§ 12022, subd. (a)(1)). Because Spence was 16 years old at the time of the crime, the trial court exercised its discretion under section 190.5, subdivision (b), and sentenced Spence to state prison for a term of 25 years to life with the possibility of parole for the murder conviction, plus a one-year enhancement for the section 12022, subdivision (a)(1) finding. The court stayed imposition of sentence on the robbery conviction pursuant to section 654.

On June 8, 1998, the other jury convicted Smithson of first degree murder (§ 187, subd. (a)) and attempted robbery (§§ 211, 664), and of being a convicted felon in possession of a firearm (§ 12021). The jury found the existence of a special circumstance in that Smithson committed the murder in furtherance of the robbery (§ 190.2, subd. (a)(17)), and found that Smithson personally used a firearm in the commission of the crimes (§ 12022.5, subd. (a)). The trial court sentenced Smithson to life imprisonment without the possibility of parole for the murder conviction and special circumstance finding. The court also sentenced him to 10 years for the gun-use finding

relating to the murder count and five years for the prior-conviction finding. The court stayed imposition of sentence on the other convictions and the gun-use finding on the robbery count pursuant to section 654. Both defendants timely appealed.

## FACTS

### A. *Evidence submitted to both juries*

On the morning of April 18, 1997, 16-year-old Tonelli burglarized a home in the Orangevale area of Sacramento County. He stole a number of items, including a butterfly knife and $1,000 in cash consisting of nine $100 bills and two $50 bills. About 10:00 a.m., Tonelli went to the house of a friend, Melissa Johnston, to share the news of his new wealth. Johnston saw Tonelli count the money and put it in his wallet. Tonelli left Johnston's home around noon on Johnston's bike, headed for 7175 Woodmore Oaks where both Spence and Smithson resided (the Spence residence). Before leaving, Tonelli informed Johnston he would return later so he could take his friends to the mall and spend money on them.

Witnesses described the Spence residence as a "crash pad" where a number of acquaintances of Spence and his family lived at various times and used illegal drugs. Barbara Spence, Spence's mother, owned a .38-caliber revolver, which she kept on a shelf inside the headboard of her bed and behind her pillows, fully loaded with five bullets. She also kept an ammunition box on her headboard. The box held 60 bullets. At that time, it contained 54 bullets. Five of the 60 were loaded in the gun, and a sixth had been previously fired. When she left for work that morning, she locked her bedroom door, as was her custom.

Along the way to the Spence residence, Tonelli met Frank Cianciolo, a housemate of Spence and Smithson's. Tonelli told Cianciolo he was going to the Spence residence and asked if Spence was home. When Cianciolo informed him Spence was home sleeping, Tonelli said he knew that because he had just spoken with Smithson by telephone.

At approximately 3:30 that afternoon, another resident of the Spence residence, Aaron Umfleet, and his girlfriend, Marshelle Birchman, arrived at the Spence residence to wash their laundry. Tonelli was there when they arrived. Umfleet informed Tonelli he did not have money he owed Tonelli, but Tonelli told him "don't trip." Tonelli stated he had $1,000 and fanned a large amount of cash before Umfleet.

Tonelli showed Umfleet a small baggie of methamphetamine and offered it to Umfleet. Smithson, however, stated Tonelli had already promised to

give the drugs to him. Tonelli agreed, and did not give the drugs to Umfleet. Instead, Tonelli agreed to give Umfleet $150 to buy drugs, resell them at a profit, and then pay Tonelli back. During his time at the Spence residence, it appeared to Umfleet that Smithson did not let Tonelli out of his sight.

About 3:50 p.m., Birchman told Umfleet they had to leave, even though they had not yet washed their laundry. Smithson, who appeared to Umfleet to be "jacked up" on methamphetamine, also told Umfleet and Birchman at least three times they had to leave immediately. Smithson asked Umfleet to pick up some money for him. Umfleet replied he did not understand, but Smithson stated Birchman would understand.

Birchman, however, stated Smithson asked them to leave because a drug transaction was about to occur in the house and he needed them to leave for about 30 minutes. He told them he would give them $50 to give him a ride somewhere when they came back. Smithson had not offered that much money for a ride before.

As Umfleet and Birchman left, Spence was sitting in his bedroom smoking marijuana. He was wearing pants and a white T-shirt at that time. Tonelli walked Umfleet and Birchman outside, with Smithson following behind them. Tonelli then gave Umfleet the $150. When Umfleet and Birchman left, Tonelli, Spence, and Smithson were the only people they knew to be inside the Spence residence at that time.

At some point after 4:00 p.m., Spence arrived at the home of Jessica Hitson, located three houses away from the Spence residence. Spence was crying. He was wearing pants but not a shirt, and was carrying his shoes. He did not have any blood on him. Hitson let Spence into her house, and at 4:38 p.m. she telephoned 911.

Meanwhile, Smithson had placed a 911 telephone call at 4:36 p.m. In his opening brief, but without citing to the record, Smithson claims he was frantic during the call and told the operator Tonelli had been shot. He also mentioned Russian Roulette. The operator told Smithson to place a towel on Tonelli's neck to stop the bleeding.

Sheriff's deputies arrived at the Spence residence shortly thereafter. They found Smithson in Spence's bedroom kneeling over Tonelli with his right hand on Tonelli's neck. Tonelli was lying on his back on a mattress and was bleeding heavily. Smithson was asking for help and saying, "don't die on me." Deputies noticed a handgun on the floor about five feet away from Smithson.

A deputy took custody of Smithson and placed him in the backseat of a patrol car. Smithson was frantic and crying, and had blood on his hands and shirt. While being escorted to the car, Smithson said, "I didn't mean it, we were just fooling around" and "it was an accident." When he first sat in the car, Smithson was concerned about the blood on his hand and asked the observing deputy to "please get this shit off me." When the deputy said he couldn't help him, Smithson repeated, "Oh God, help me please, oh, shit."

Smithson stayed in the car for approximately two and a half hours. During that time, he made the following statements: "Is he going to be all right? Can you call and see if he is going to be all right? Please clean me up. I fucking told him. I fucking told him. Can you find out how he is? Let me out of here. Am I under arrest? Where did they take him? Where is he at? Please call my mom. Am I under arrest? Handcuff me or something. Why did this happen? If they put my face on TV I'll sue them. Please get me something to clean this off. I need to wash this off. Damn it, get this off me, please. What was he thinking?" When a television cameraman started filming Smithson through the car window, Smithson said, "Stupid, stupid, stupid, as stupid as, mother fucker, I have enough problems, asshole."

By the time paramedics arrived, Tonelli had died. Deputies recovered various items from the body, including a butterfly knife and a baggie of methamphetamine. Deputies also recovered Tonelli's wallet, but there was no money in it. Deputies, investigators and witnesses were unable to find any money at the Spence residence.

At 4:44 p.m., another deputy reported to Hitson's home and found Spence sitting on the floor crying and talking incoherently. The deputy detained Spence in the rear seat of his patrol car and returned to the Spence residence.

Subsequently, deputies performed gunshot residue tests on Spence and Smithson. The tests revealed only one particle of possible gunshot residue on the back of Spence's left hand, but he had washed his hands prior to the test. Smithson's hands had blood on them. They also had gunshot residue particles, indicating he had either discharged a firearm or had been close to a firearm when it discharged. After completing the residue tests, deputies transported Spence and Smithson to the sheriff's station in downtown Sacramento.

At the Spence residence, deputies analyzed the blood found in Spence's bedroom. They also found blood on the door handle and deadbolt on the inside of the front door of the house. They collected, among other items, the handgun, determined to be a .38-caliber Rossi revolver; a butterfly-style

knife, and a box of ammunition. The gun contained one spent shell casing. Smears and droplets of blood were on the gun, which were determined to have been caused by back spattering from a high-impact or close contact gunshot wound. The droplets of blood on the gun and the back of Smithson's hands, along with the residue test results, were consistent with Smithson's firing the weapon.

Forensic evidence demonstrated Tonelli was shot in the upper left neck. The gun was held so close to Tonelli's neck it left an imprint. The bullet traveled left to right, front to back and downward at an angle of about 45 degrees. It struck the right carotid artery, and exited out the back of the upper right arm. The pathologist who conducted the autopsy concluded the wound was not self-inflicted because the bullet's path angled downward into the neck, not upward into the head as most self-inflicted gunshot wounds in the neck tend to be.

### B. *Additional evidence submitted to the Spence jury*

Before the Spence jury only, Hitson testified that after she let Spence into her house, Spence informed her Smithson had shot Tonelli. She asked Spence if he had called the police yet, but he had not. Spence said Smithson was going to call the police and say Tonelli shot himself. Hitson then called 911 and Spence joined in the phone conversation. After the phone call, Hitson gave Spence a T-shirt to wear.

During the 911 telephone call, Spence informed the operator that Smithson shot Tonelli. Spence had not seen what had happened because he had been in the bathroom. Smithson, though, had told Spence that Smithson was going to take some money from Tonelli, and Tonelli grabbed the gun. Other than that, Spence did not know what had happened.

Before the Spence jury only, the deputy sheriff who reported to Hitson's residence, Greg Gillum, testified that Spence explained he had been at the Spence residence with Smithson when Smithson received a phone call from Tonelli. Then Smithson asked Spence if Spence wanted to "come up" on some money. Spence interpreted that statement as meaning Smithson was going to take money from Tonelli. About 20 minutes after Tonelli arrived at the Spence residence, Spence went into the bathroom. While there, Spence heard what he thought was a loud knock on the wall. Smithson then came running in saying, "I shot him, I shot him. He grabbed for the gun, and I shot him." Spence saw what happened, then ran to Hitson's home. Spence informed Gillum the gun was his but it was not normally kept in his room. Gillum then detained Spence in the rear seat of his patrol car for about an hour.

At the sheriff's station that evening, Spence signed a form waiving his rights under *Miranda*, and gave a statement to a detective. He was videotaped while making his statement. The Spence jury, but not the Smithson jury, viewed the videotape and received a transcript of the statement. In his statement, Spence said he had been sleeping when Smithson awoke him and asked if he wanted to "come up" on $500. Smithson said Tonelli had just called and was coming over with $1,000.

They discussed ideas about how to get the money from Tonelli. Ultimately, Spence said he knew how to do it. He then walked to the door of his mother's bedroom, used a butter knife to open the locked door, and retrieved her gun from her bed. Spence told Smithson he would use the gun to make Tonelli empty his pockets and give them the money and then make him leave. Smithson nodded in agreement.

They went back to Spence's room where Spence put the gun under his pillow and lay down on it. About five minutes later, Tonelli arrived. Smithson let Tonelli in, they talked for a few minutes, and then walked back to Spence's bedroom where Spence was still lying on his bed. Tonelli showed them some of the money and put the cash back in his wallet. Tonelli said he only had $900 then. They engaged in some drug use. Spence asked Tonelli to retrieve the phone for him so he could call his girlfriend, which Tonelli did.

Smithson suggested Tonelli bring Tonelli's bike into the house so it would not be stolen. When Tonelli left the room to do so, Spence informed Smithson he did not want to go through with their plan. But Spence asked Smithson if Smithson was going to "do it." Smithson said "Yeah" and asked for the gun. Spence handed him the gun.

Smithson stood up and placed the gun behind the waistband of his pants and under his shirt. Shortly thereafter, Tonelli walked back into the bedroom. Spence then excused himself so he could use the bathroom, in part because he had to and also because he did not want to be present when Smithson robbed Tonelli.

Spence went into the bathroom and shut the door behind him. After urinating, he turned on the water in the sink to wash his face and run water through his hair. While the water was on, he heard a "real hard thump on the bathroom door." While Spence was looking for a towel, the bathroom door flew open and Smithson came in yelling, "I shot him. I shot him. He grabbed the gun. It ain't my fault. It ain't my fault. He grabbed the gun. He grabbed the gun."

Yelling "no, no, no," Spence went back into his bedroom, grabbed his shoes, and saw Tonelli lying faceup on the bed choking on blood. Smithson still had the gun in his hands, and was wiping it off with his shirt. Spence repeatedly told him to call 911. Smithson said he would, and that he would tell the operator Tonelli was smoking methamphetamine and shot himself. Spence turned to leave out the front door to go to Hitson's house. While leaving, Spence saw Smithson unload the gun and drop the bullets onto the kitchen table.

Spence admitted he knew his mother's gun was loaded when he retrieved it. He also stated that even though he did not want to participate in the robbery, he did not suggest that they not commit the act because "$900 sounded good" to him. Despite not wanting to use the gun on Tonelli, Spence still believed Smithson would split the money with him.

Spence stated he and Tonelli were friends. Yet Spence wanted to rob Tonelli because Spence was "being greedy" and because Tonelli had stolen from him before. Spence had not intended to shoot Tonelli, and he never thought about what would happen if Tonelli resisted or reported the crime to the police.

We discuss other evidence presented at trial where relevant.

SPENCE APPEAL

I

*Hearing on Suppression Motion*

Spence claims the trial court denied him due process by not allowing him a full evidentiary hearing to rehear witnesses on his renewed motion to suppress introduction of his confession into evidence. We disagree.

Spence first objected to introduction of his confession on the basis of *Miranda* at his preliminary hearing. At the same time, he requested a hearing on the validity of his waiver of rights to remain silent and to the assistance of counsel. He asked the magistrate to conduct the suppression hearing after the People had concluded their case in the preliminary hearing. The magistrate confirmed that Spence wanted his hearing before the magistrate and that all of the parties agreed to this procedure.

Following the People's presentation, Spence called four witnesses and also took the stand himself. Each of these witnesses testified in part to facts

bearing on the validity of Spence's waiver. One of the witnesses was Dr. Eugene Roeder, a forensic psychologist, who testified concerning Spence's mental and intellectual ability to understand the *Miranda* warning. Spence also cross-examined each of the People's witnesses. Following the hearing, the magistrate denied Spence's motion.

Before trial began, Spence renewed his motion to suppress his confession and sought a full evidentiary hearing. The trial judge read a new report regarding additional neuropsychological tests performed on Spence. He allowed Spence to call Dr. Roeder to testify on any new information the report may have added to the doctor's earlier testimony. The judge also heard additional testimony from Spence's mother. Finally, the judge read the preliminary hearing transcript and viewed the videotape of Spence's confession. The judge commented:

"THE COURT: [I]n terms of a full-blown hearing, you have brought an expert here and his testimony is basically that his testimony is substantially the same as he gave Judge Garcia [the preliminary hearing magistrate] with the exception that it is reinforced. So when you reference a full-blown hearing, I don't understand what you mean except you want to do it all over again and let me make a decision because you are not happy with the decision that Judge Garcia made.

"MR. MILLARD [counsel for Spence]: Well, actually, your Honor, you are correct."

The trial court took the motion under submission without allowing Spence to call any additional witnesses or to reargue the evidence presented at the preliminary hearing. The court thereafter denied the motion on the merits, finding there was no violation of Spence's *Miranda* rights and that Spence voluntarily waived his right to remain silent. Spence challenges the trial court's refusal to rehear the witnesses who testified at the preliminary hearing.

A defendant who has confessed to the commission of a crime has a "constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." (*Jackson v. Denno* (1964) 378 U.S. 368, 376-377 [84 S.Ct. 1774, 1780-1781, 12 L.Ed.2d 908, 915-916, 1 A.L.R.3d 1205].) Such a defendant "is entitled to a determination of the voluntariness of his confession in the state courts in accordance with valid state procedures . . . ." (*Id.* at p. 393 [84 S.Ct. at p. 1789].) Due process "requires 'that a jury [not] hear

a confession unless and until the trial judge [or some other independent decision maker] has determined that it was freely and voluntarily given.' [Citations.]" (*Crane v. Kentucky* (1986) 476 U.S. 683, 687-688 [106 S.Ct. 2142, 2145, 90 L.Ed.2d 636, 643].)

■ California law is in accord: "The timely *Miranda* objection imposed on the trial court a procedural duty to determine the existence or nonexistence of the preliminary fact, i.e., appellant's waiver of his *Miranda* rights, out of the presence of the jury. (Evid. Code, §§ 310, 402, 405; *People* v. *Rowe* (1972) 22 Cal.App.3d 1023, 1030 [99 Cal.Rptr. 816].) That a defendant is entitled to a voir dire hearing on the *Miranda* question before his extrajudicial statements are admitted into evidence is beyond question. [Citations.] And while the trial court need not make formal findings, its determination on the *Miranda* question must be reflected in the record with 'unmistakable clarity.' (*Sims* v. *Georgia* (1967) 385 U.S. 538, 544 [17 L.Ed.2d 593, 598, 87 S.Ct. 639, 643]; *People* v. *Rowe, supra,* 22 Cal.App.3d at p. 1029.)" (*People v. Bennett* (1976) 58 Cal.App.3d 230, 235-236 [129 Cal.Rptr. 679].)

In determining whether the trial court's procedure violated Spence's due process rights, we are guided by the United States Supreme Court's direction regarding the application of the due process clause to state criminal procedures. ■ Because a state has the power to adopt and regulate criminal procedures under which its laws are carried out, " 'its decision in this regard is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." [Citations.]' . . . [B]ecause the States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to legislative judgments in this area." (*Medina v. California* (1992) 505 U.S. 437, 445-446 [112 S.Ct. 2572, 2577, 120 L.Ed.2d 353, 363].)

■ California criminal procedure allows a defendant to obtain a hearing on the validity of a confession at different times during the process of prosecution. The hearing can result from an objection raised at the preliminary hearing or any pretrial hearing where the prosecution attempts to introduce the confession. It can occur pursuant to a motion under section 995 to set aside the information or indictment where the objection was overruled at the preliminary hearing. The hearing can also occur pursuant to a pretrial common law motion or motion in limine, or it can occur following an objection raised during trial. (See generally Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 4th ed. 1998) Confessions and Admissions, § 30.9, pp. 751-752.)

However, a ruling made at the preliminary hearing or pursuant to a common law pretrial motion regarding the admissibility of a confession is not binding on the trial court should the defendant renew a previously denied motion. (*People v. Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 734 [125 Cal.Rptr. 798, 542 P.2d 1390].)

■ At issue here is whether due process required the trial court to rehear Spence's witnesses and give Spence a new and full hearing on his motion to suppress his confession after such a hearing had already been held by the magistrate. Neither party cites any published authority that directly resolves this issue, and we have found none ourselves.

Spence cites *People v. Fowler* (1980) 109 Cal.App.3d 557, 564 [167 Cal.Rptr. 235], disapproved on another point in *People v. Humphrey* (1982) 138 Cal.App.3d 881, 882 [188 Cal.Rptr. 473], where this court stated: "It is the law in California that, in a criminal action, if a defendant objects to the admissibility of a confession or admission on any ground, the court must determine the question of admissibility by (a) conducting a hearing out of the presence and hearing of the jury if the defendant (or the People) so requests, and (b) permitting all parties at such hearing to introduce evidence on the question of admissibility, including the defendant's personal testimony."

*Fowler* concerned the propriety of a suppression hearing that was held before a jury. It did not involve the denial of a full evidentiary hearing before the trial court after the defendant received a full hearing before the committing magistrate. The case offers little guidance here.

The People cite *People v. Clark* (1992) 3 Cal.4th 41 [10 Cal.Rptr.2d 554, 833 P.2d 561]. While *Clark* is instructive, it is not dispositive. The defendant in *Clark* brought a pretrial motion before a superior court judge to suppress his statements on *Miranda* grounds. He brought the motion after he had been held to answer in the preliminary hearing. The judge conducted an evidentiary hearing and denied the motion. At trial, the defendant renewed the motion, but the trial court refused to rehear it.

The Supreme Court held the trial court did not commit error: "[A] defendant is not entitled to two separate evidentiary hearings before two superior court judges on the issue. We need not decide whether the trial court had the *authority* to allow defendant a second hearing and to disagree with [the first judge's] decision; it was certainly not *required* to do so. Such a requirement would completely defeat the purpose behind pretrial in limine hearings on the admissibility of evidence." (*People v. Clark, supra,* 3 Cal.4th at p. 119, some italics omitted.)

*Clark* is not factually on point with this case. There, the first suppression hearing was held by a superior court judge after that court had gained jurisdiction over the defendant. Here, the first suppression hearing was held at the preliminary hearing, before the superior court gained jurisdiction over Spence. We next determine whether that distinction requires a different conclusion.

■ Due process calls for a "hearing appropriate to the nature of the case." (*Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 313 [70 S.Ct. 652, 657, 94 L.Ed.2d 865, 873].) The essential elements of due process accorded in a hearing traditionally consist of the right to produce evidence and cross-examine adverse witnesses (*Fewel v. Fewel* (1943) 23 Cal.2d 431, 433 [144 P.2d 592]), the right to appear by counsel (*Mendozza v. Small Claims Court* (1958) 49 Cal.2d 668, 673 [321 P.2d 9]), and the right to an impartial decision maker (*Tumey v. Ohio* (1927) 273 U.S. 510, 531 [47 S.Ct. 437, 444, 71 L.Ed. 749, 757-758, 50 A.L.R. 1243]).

Our Supreme Court has summarized a criminal defendant's due process rights in an evidentiary hearing as follows: "The United States Supreme Court has described the right of the defendant in a criminal trial to due process as 'the right to a fair opportunity to defend against the State's accusations.' [Citation.] Similarly, 'the spirit and purpose' of the right to due process under the California Constitution is 'to assure to everyone a full and ample opportunity to be heard before he can be deprived of his liberty or his property.' [Citation.] However, the procedures at a suppression hearing before a judge need not be the same as those available to a defendant at trial. [Citations.] Nonetheless, at a suppression hearing, the defendant must have a fair opportunity to litigate the claim." (*People v. Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694].)

*Hansel* concerned a due process challenge to the procedure provided by section 1538.5, subdivision (i). That statute allows a defendant to suppress evidence obtained from an illegal search or seizure by bringing a suppression motion at the preliminary hearing. The defendant may renew the motion in superior court if the magistrate denies the motion at the preliminary hearing. However, the defendant is limited to presenting the preliminary hearing transcript and introducing only evidence that could not have been presented at the preliminary hearing.

Determining whether this statutory scheme satisfied due process, the Supreme Court noted the two suppression hearings could not be viewed in isolation from each other. This was clear from the limited scope of evidence admissible in the superior court following the hearing by the magistrate at

the preliminary hearing. "However, when all the provisions for litigating the validity of a search or seizure are viewed as a whole, they clearly afford criminal defendants a fair opportunity to litigate their claims." (*People v. Hansel, supra*, 1 Cal.4th at p. 1220.)

Here, the trial judge's response to Spence's renewed motion to suppress mirrored the procedure provided under section 1538.5. As with the Supreme Court in *Hansel*, when we view the two suppression hearings Spence received as a whole, we conclude he was afforded a fair opportunity to litigate his objection and was thus accorded all process due him.

Spence chose to have a suppression hearing before the magistrate, who afforded him a full opportunity to present evidence in support of his motion and to examine all of the People's witnesses. The trial judge allowed Spence to submit any additional evidence that he had not presented to the magistrate. At the close of his evidence before the trial judge, Spence stated he had no further evidence to add to what had already been presented.

Throughout both hearings, Spence was represented by counsel. He does not challenge the effectiveness of his counsel's representation on this appeal. He also does not claim the magistrate or the trial judge was biased in hearing and ruling on the motion.

Under these circumstances, where the trial judge considered all the evidence independently, the requirements of due process were satisfied. As with administrative agency adjudications, due process does not require the ultimate fact finder in a suppression hearing to see and hear the witnesses testify. The judge had discretion to hear them if needed, and may have been required to rehear them if he had rejected the magistrate's findings, but otherwise the judge was not constitutionally mandated to rehear the testimony. (*United States v. Raddatz* (1980) 447 U.S. 667, 679-681 [100 S.Ct. 2406, 2414-2415, 65 L.Ed.2d 424, 435-436].)

Spence claims he was entitled to a full hearing in the superior court under the holding of *People v. McCoy* (1983) 147 Cal.App.3d 638 [195 Cal.Rptr. 285]. *McCoy* is distinguishable. There, the defendant filed a motion to dismiss for lack of prosecution. The motion was heard and denied by a magistrate. The defendant renewed the motion before trial, but the trial judge denied the motion without affording the defendant a full hearing. On appeal following conviction, the appellate court remanded the case to the trial court for a full hearing because "[t]he judge obviously believed he was bound by the prior preliminary hearing in municipal court by a magistrate . . . [and] failed to exercise its independent discretion." (147 Cal.App.3d at p. 642.)

Here, the trial judge acknowledged it was within his discretion to rely upon or reject the findings of the magistrate. He independently reviewed the record of the preliminary hearing and independently reached his decision on the merits of the evidence presented in both hearings. Nowhere did the trial judge suggest he was bound by the magistrate's decision. *McCoy* does not apply where the trial judge exercises independent discretion to determine the scope of a second suppression hearing.

Furthermore, the *McCoy* court relied upon the language of section 1538.5, subdivision (i), as it read in 1983. At that time, the statute required the trial court to conduct a de novo hearing on a defendant's suppression motion after the motion was denied in municipal court. As discussed above, the statute no longer affords that right, and *Hansel* has upheld the current statutory process against attack on due process grounds.

Spence incorrectly argues he was entitled to another full hearing because the magistrate's ruling was not binding on the trial judge. (*People v. Crittenden* (1994) 9 Cal.4th 83, 126 [36 Cal.Rptr.2d 474, 885 P.2d 887].) The point is irrelevant. Just because the trial judge had discretion to accept or reject the magistrate's findings does not necessarily mean due process required him to grant a full hearing.

Spence attempts to distinguish this case from the holding of *People v. Clark, supra,* 3 Cal.4th 41, on the fact that his first hearing was conducted by a magistrate, not a superior court judge, and on the different functions a magistrate and a trial judge perform with the evidence before them. ▆ "At trial, the trier of fact must determine whether the evidence is sufficient to prove the charges beyond a reasonable doubt. On the other hand, at the preliminary hearing, the magistrate is called upon only to determine whether the factual showing is sufficient to establish probable cause to believe the defendant committed a felony. [Citations.]" (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 14 [44 Cal.Rptr.2d 796].) Spence claims his hearing before the magistrate could only have been directed to the sufficiency of evidence to establish probable cause. This point is without merit.

▆ When a defendant objects to introduction of a confession and claims a waiver of constitutional rights was invalid, the judicial officer to whom the objection is made must determine whether the People have proven by a preponderance of the evidence that the defendant's waiver was indeed voluntary and knowing. (*People v. Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042]; *Colorado v. Connelly* (1986) 479 U.S. 157 [107 S.Ct. 515, 93 L.Ed.2d 473] [93 L.Ed.2d 473].) This standard applies

whether it is a magistrate or a superior court judge conducting the suppression hearing. Both must determine whether the confession is legal and admissible. That a magistrate ultimately determines the existence or absence of probable cause has no relationship to the standard by which the magistrate determines the validity of a waiver of *Miranda* rights and the admissibility of a confession.

Furthermore, within the framework of determining probable cause, "the magistrate may weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses. [Citation.] In other words, in assisting him in his determination of 'sufficient cause,' the magistrate is entitled to perform adjudicatory functions akin to the functions of a trial judge." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511 P.2d 609].) Indeed, it is error for a magistrate not to allow a defendant to put on evidence at the preliminary hearing regarding the validity of confessions. (*People v. Neal* (1942) 53 Cal.App.2d 379, 381, 383 [127 P.2d 996].)

██ Most importantly, it does not matter how the magistrate considered the evidence because the trial judge considered the evidence independently. Pursuant to Evidence Code sections 402 and 405, the trial court provided Spence with a hearing on his renewed motion and ruled on the motion without regard to the magistrate's ruling. In this context, due process was not violated by the trial judge's reviewing sworn testimony from a transcript of the pretrial motion to suppress instead of rehearing the testimony in person. The trial court considered the matter anew, and that was all the process due Spence in this instance.

For all of the reasons stated, we conclude the process used by the trial court in this case did not offend fundamental principles of justice and provided Spence a full and fair opportunity to litigate his objection to introducing his confession into evidence. The trial court did not deny Spence due process.

## II

### *Waiver of Miranda Rights**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### *Felony-murder Jury Instruction*

██ Spence claims the trial court committed prejudicial error by instructing the jury Spence should be convicted of first degree murder if his

*See footnote, *ante*, page 480.

accomplice in the robbery killed the victim by accident. We disagree with Spence's claim.

The trial court gave to the jury the following instructions on felony murder:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime.

"The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." (CALJIC No. 8.21.)

"If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." (CALJIC No. 8.27.)

Spence does not dispute that his actions aided, promoted or encouraged the commission of a robbery or attempted robbery. Rather, he argues the felony-murder rule should not serve as a basis to convict an accomplice where the killing of an innocent person occurred accidentally. He cites no direct authority for his argument. Instead, Spence claims our Supreme Court has shown an intent to narrow the judicially created scope of the felony-murder rule. So narrowed, the rule, he argues, may no longer extend to accomplices of crimes specified in section 189 that result in accidental killings.

In *People v. Pulido* (1997) 15 Cal.4th 713 [63 Cal.Rptr.2d 625, 936 P.2d 1235], the Supreme Court acknowledged that its past "descriptions of an accomplice's liability [under the felony-murder rule] have limited complicity to killings occurring while the killer was acting in furtherance of a criminal purpose common to himself and the accomplice [see *People v. Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130]; *People v. Vasquez* (1875) 49 Cal. 560], or while the killer and accomplice were jointly engaged in the felonious enterprise [see *People v. Martin* (1938) 12 Cal.2d 466 [85 P.2d 880]; *People v. Perry* (1925) 195 Cal. 623 [234 P. 890]]." (*People v. Pulido, supra,* 15 Cal.4th at p. 719.)

Under the first line of cases, accomplice liability arises when the killing is committed " 'in furtherance of their common purpose to rob.' [Citations.]" (*People v. Pulido, supra,* 15 Cal.4th at p. 721.) Under the second line, "the killing need have no particular causal or logical relationship to the common scheme of robbery; accomplice liability attaches, instead, for any killing committed while the accomplice and killer are 'jointly engaged' in the robbery. [Citations.]" (*Id.* at p. 722.)

The *Pulido* court did not determine whether one of these lines of cases was no longer controlling. However, Spence claims the *Pulido* court has shown an intent to favor only the first line. Thus, he argues we should apply the felony-murder rule only where the killing occurs in furtherance of the defendants' common purpose to rob. Further, he asserts an accidental killing cannot, as a matter of logic, be committed in furtherance of a common purpose, and thus should not trigger liability under the felony-murder rule. We reject both of Spence's claims.

First, because the *Pulido* court did not disapprove either line of felony-murder cases, both are still valid and we are duty-bound to comply with the Supreme Court's directives in each. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) Felony-murder liability would clearly attach to Spence under the *Martin-Perry* line of cases. The killing occurred while both defendants were jointly engaged in the commission of a robbery.

Second, even if the *Martin-Perry* line of cases was no longer valid law, liability would attach to Spence under the *Washington-Vasquez* line of authority as well. Under *Washington,* "all persons aiding and abetting the commission of a robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design." (*People v. Washington, supra,* 62 Cal.2d at p. 782.)

The evidence demonstrates both Spence and Smithson shared a common design to rob the victim and share the proceeds. The evidence also shows the victim was killed while Smithson was acting in furtherance of their common design to rob. This evidence sufficiently supports a conviction of felony murder.

However, Spence claims "it is logically impossible to commit an accidental killing in furtherance of a common design to commit a felony. To commit an act in order to further a plan necessarily implies a purposeful act rather than an accidental one." Spence's formulation attempts to graft an element of premeditation or malice onto the act of killing and thereby misapplies the

felony-murder rule. The issue is not whether a defendant plans or intends to kill. The issue is whether a killing occurred in the course of the commission of a felony and, under *Washington*, whether that killing aided in the progression and consummation of the felony. How that killing occurred and whether it was intentional are irrelevant.

 " 'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life. "Under well-settled principles of criminal liability a person who kills—whether or not he is engaged in an independent felony at the time—is guilty of murder *if he acts with malice aforethought*. The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally[,] operates to posit the existence of that crucial mental state—and thereby to render irrelevant evidence of actual malice or the lack thereof—when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it." [Citations.]' " (*People v. Tabios* (1998) 67 Cal.App.4th 1, 7 [78 Cal.Rptr.2d 753], quoting *People v. Hansen* (1994) 9 Cal.4th 300, 307 [36 Cal.Rptr.2d 609, 885 P.2d 1022], italics in original.)

 The jury instruction accurately described the current law governing the crime of felony murder.

### IV-VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### SMITHSON APPEAL

### I-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### V

*Unauthorized Sentence*

 The People assert Smithson's sentence on the murder conviction was unauthorized. The People raise this point without having filed an appeal. However, it is " 'well established that when the trial court pronounces a sentence which is unauthorized by the Penal Code that sentence must be vacated and a proper sentence imposed whenever the mistake

---

*See footnote, *ante*, page 480.

is appropriately brought to the attention of the . . . reviewing court.' [Citation.] Consequently, the People may challenge an 'unauthorized sentence' even on a defendant's appeal." (*People v. Rowland* (1988) 206 Cal.App.3d 119, 126 [253 Cal.Rptr. 190].)

The trial court sentenced Smithson to life without the possibility of parole (LWOP) for the conviction of first degree murder with a special circumstance. The prosecutor raised no objection to this sentence before the trial judge. However, since Smithson was also found to have a prior serious felony conviction, the People on appeal claim the trial court was required to double Smithson's LWOP term under section 667, subdivision (e)(1) (subdivision (e)(1)), a part of the "Three Strikes" law. We disagree.

Subdivision (e)(1) reads: "If a defendant has one prior felony conviction that has been pled and proved, the *determinate term* or *minimum term for an indeterminate term* shall be twice the term otherwise provided as punishment for the current felony conviction." (Italics added.) The People claim this language "makes absolutely no provision to exclude an LWOP sentence from being doubled as a second strike . . . ." To the contrary, the unambiguous language of the statute clearly excludes LWOP sentences from being doubled, or, to paraphrase the People, the statute's language "makes absolutely no provision" to double LWOP sentences.

Under subdivision (e)(1), only two types of sentence terms are doubled: a determinate term and the minimum term of an indeterminate term. A determinate sentence is one "consisting of a specific number of months or years in prison." (*People v. Jefferson* (1999) 21 Cal.4th 86, 92 [86 Cal.Rptr.2d 893, 980 P.2d 441].) An indeterminate sentence means "the defendant is sentenced to life imprisonment." (*Ibid.*) Some indeterminate sentences carry minimum terms either expressly or via other statutes which establish a minimum time that must be served under an indeterminate sentence before a convict can be eligible for parole. (*Id.* at p. 96.)

An LWOP sentence is an indeterminate sentence *without* a minimum term. The People cite no authority by which we may write a minimum term into an LWOP sentence where none exists. Because an LWOP sentence is not a determinate term and does not contain a minimum term, it is not subject to the doubling requirement of subdivision (e)(1).

Since the parties completed briefing in this case, the Second District Court of Appeal reached the opposite conclusion on this issue in *People v. Hardy* (1999) 73 Cal.App.4th 1429, 1433-1434 [87 Cal.Rptr.2d 279]. The *Hardy* court purported to apply the codified "intent" of the Three Strikes law to

construe the meaning of subdivision (e)(1). Such construction, however, is unnecessary and improper because the statutory language is clear and unambiguous. When statutory language is clear and unambiguous, "there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . [citations.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) For this reason, we may not adopt the ruling of *People v. Hardy*. Instead, we rest our opinion, as we must, on the clear language of subdivision (e)(1).

Both the People and the *Hardy* court claim interpreting subdivision (e)(1) to require doubling of LWOP sentences is consistent with section 669 and cases interpreting that statute. Section 669 offers little guidance here. When a person receives *two* or more life sentences for the conviction of two or more crimes, section 669 authorizes a court to impose those sentences consecutively. This case concerns the imposition of only *one* life sentence and whether the term of that sentence should be doubled under subdivision (e)(1). Section 669 does not speak to this case.

At best, section 669 demonstrates the Legislature knows how to draft statutes that require the doubling of sentence terms, even the incomprehensible doubling of life terms without parole, should it choose to do so. Had the Legislature chosen to double an LWOP term under subdivision (e)(1), it could have done so easily. Instead, it expressly chose only to double sentence terms that could mathematically be doubled—determinate terms and the minimum terms of indeterminate terms. It nowhere, expressly or implicitly, doubled indeterminate terms.

We are bound to follow the clear language of subdivision (e)(1) as written. The trial court acted correctly. It simply had no authority to double the term of Smithson's LWOP sentence. Thus, the sentence imposed complied fully with the Three Strikes law, spirit and letter, and could not result in an unauthorized sentence. Maybe that is why the prosecutor never asked the trial court to double the sentence.

## DISPOSITION

The judgments against Spence and Smithson are affirmed in their entirety.

Blease, Acting P. J., and Hull, J., concurred.

The petitions of respondent and both appellants for review by the Supreme Court were denied July 19, 2000. Mosk, J. and Brown, J., were of the opinion that the petition of appellant Charles Frank Spence should be granted.