[No. C058218. Third Dist. Oct. 9, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
SEAN NICHOLAS COYLE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I.–VI. and IX. of the Discussion.

Counsel

Jerry D. Whatley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**CANTIL-SAKAUYE, J.**—Defendant Sean Nicholas Coyle killed a drug dealer named Samuel Trujillo.[1] A jury convicted defendant of the three counts of murder alleged in the information: murder with a true finding of the special circumstance that the murder was committed during the commission or attempted commission of a burglary (Pen. Code,[2] §§ 187, subd. (a), 190.2, subd. (a)(17)(G); count I); murder with a true finding of the special circumstance that the murder was committed during the commission or attempted commission of a robbery (§§ 187, subd. (a), 190.2, subd. (a)(17)(A); count II); and second degree murder (§ 187, subd. (a); count III). On all three counts, the jury found true the following gun enhancements: that defendant personally used a firearm in the commission of the offense (§§ 12022.5, subd. (a), 12022.53, subd. (b)), and that a principal was armed with a firearm in the commission of the offense (§ 12022, subd. (a)(1)). The jury failed to reach verdicts on two other firearm enhancement allegations (§ 12022.53, subds. (c), (d)), and the trial court declared a mistrial as to those allegations. In a bifurcated trial, the jury found defendant had previously been convicted of 14 counts of burglary.

The trial court sentenced defendant on count I to state prison for an indeterminate term of life without the possibility of parole (LWOP), tripled under the three strikes law (§ 667, subd. (e)(2)(A)(i)), plus a consecutive 10-year term for the personal use of a firearm (§ 12022.53, subd. (b)). The trial court imposed but stayed a one-year term for the section 12022, subdivision (a)(1) enhancement and a four-year term for the section 12022.5, subdivision (a) enhancement. The trial court imposed but stayed the same sentence terms for count II and its enhancements. On count III, the trial court imposed but stayed an indeterminate term of 45 years to life (15 years tripled for defendant's prior strikes), plus the same terms for the enhancements. As relevant on appeal, the trial court imposed both a restitution fine of $10,000

---

[1] Defendant's first trial before Judge Wagoner resulted in a mistrial.

[2] Hereafter, undesignated statutory references are to the Penal Code.

under section 1202.4, subdivision (b), and a parole revocation fine in the same amount under section 1202.45.

On appeal, defendant asserts the following nine claims of error. (1) The trial court denied him his constitutional rights when it refused to declare a mistrial due to jury misconduct and failed to conduct sufficient inquiry of Juror No. 11 to determine whether good cause for discharge existed. (2) The trial court erred when it refused to allow testimony of Heather Waters that would have undermined the credibility of corroborating witness Amber Fairchild. (3) The trial court erred in denying defendant's request to re-call Elizabeth Millstine for further cross-examination. (4) The trial court erred in limiting impeachment of Gilbert Cuevas and Amber Fairchild by excluding reference to some of their prior convictions. (5) The trial court denied him his constitutional rights by restricting the cross-examination of Amber Fairchild, Jean Winters, and Kellie Henderson regarding receipt of inducements for their testimony. (6) The cumulative effect of the errors requires reversal. (7) He was improperly convicted of three separate counts of murder in violation of his constitutional rights. (8) The trial court erred when it "tripled" the LWOP sentence. (9) The trial court erred in imposing a parole revocation fine.

In the published portion of the opinion, we agree with defendant's claims that he was improperly convicted of three counts of murder and that the trial court erred in tripling his LWOP sentence. Accordingly, we shall modify the judgment to reflect defendant was convicted in count I of murder with true findings on the special circumstances that the murder was committed during the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)) and a burglary (§ 190.2, subd. (a)(17)(G)), plus true findings that defendant personally used a firearm in the commission of the offense (§§ 12022.5, subd. (a), 12022.53, subd. (b)) and that a principal was armed with a firearm in the commission of the offense (§ 12022, subd. (a)(1)). We shall modify the portion of the sentence imposed by the trial court for count I that imposed a triple indeterminate LWOP term to instead impose a single indeterminate LWOP term. We shall also reverse and vacate the convictions and sentences in counts II and III. In the unpublished portion of the opinion, we shall strike the parole revocation fine and, in all other respects, we shall affirm the judgment.

## FACTUAL BACKGROUND

Samuel Trujillo was a methamphetamine dealer and his house in Diamond Springs was a well-known drug house. Kellie Henderson was friends with Trujillo and had lived at his house off and on over the course of several years. She was living at his house in October 2003, but was in the process of

moving out because their friendship was dissolving over her belief Trujillo had failed to keep promises he had made to her.

About two weeks prior to the murder, Henderson met defendant and became intimate with him. A week or so before the murder, Henderson came up with the idea to rob Trujillo for drugs and money. She discussed the idea with defendant. As they both wanted more methamphetamine and some money, Henderson and defendant decided on a plan to rob Trujillo at his house. Defendant would go inside and rob Trujillo while Henderson waited outside. Henderson knew where to get a gun.

Henderson and defendant drove to Trujillo's house on the evening of October 3, 2003, in defendant's gray Chevrolet El Camino. They arrived around 8:00 p.m., packed some of Henderson's property into defendant's car and left around 10:00 p.m. They returned about an hour later. Henderson called her ex-boyfriend, Bobby Lee, who agreed to provide her with a gun to use in the robbery. Defendant and Henderson left Trujillo's house a second time and drove to Placerville, where they met Lee. Lee handed defendant a .44-caliber revolver. Both he and defendant loaded the gun. Defendant and Henderson returned to Trujillo's house. Rosalyn Snyder, Anthony Birge, Elizabeth Millstine, and Trujillo were inside the house. All of them had been drinking alcohol and/or using methamphetamine. Gilbert Cuevas and his girlfriend Marcie Zylla were outside sleeping in the back of a Chevrolet Blazer parked in Trujillo's backyard.

Henderson went into her bedroom with defendant to discuss what was going to happen. Snyder was in the bedroom with them helping Henderson pack. Henderson told Snyder that she and defendant were going to "jack" (meaning rob) Trujillo. Snyder did not want anything to do with the plan. Defendant told her it was going to happen whether she liked it or not. Snyder told them she was going to "find a ride out of there." She went into the living room and asked Birge for a ride, but he told her no. Henderson ended up giving Snyder a ride. Birge left and walked to his home a short distance from Trujillo's house.

When Henderson returned, she confirmed with defendant that they were going to go ahead with the robbery. She checked around the house to see who was still present. Millstine was in the bathroom. Cuevas and Zylla were still in the backyard. Trujillo was on the couch in the living room. Henderson reported Millstine's location to defendant. Then she went outside to defendant's car and started its engine running.

From inside the bathroom, Millstine heard Trujillo say "knock it off." She left the bathroom and walked down the hall to the living room, where she

saw defendant pointing a gun at Trujillo. Millstine heard defendant say "[G]ive me your money," "[G]ive me your dope" and "I'm going to fucking kill you." Trujillo said "okay, okay." Millstine ran back to the bathroom, locked the door and tried to hide. While she was hiding, Millstine heard a further exchange between defendant and Trujillo. Defendant wanted Trujillo's money and dope. Trujillo said, "that's all I've got." Defendant said he knew Trujillo had more drugs buried in the backyard. Trujillo denied it and told defendant, "[Y]ou don't know who you're messing with . . . ." Millstine heard defendant "barking" like a dog at Trujillo, like he was taunting him. She heard someone say, "shoot him, shoot him." Millstine heard a single gunshot, followed by the sound of a door opening or shutting and then a car pulling away. She ran out to the living room where she saw Trujillo lying on the floor, bleeding from the chest. Millstine ran out to the driveway and called 911.

Cuevas, who was lying awake in the Blazer that night, noticed defendant looking out of Henderson's bedroom window, and later heard defendant and Trujillo arguing. Defendant wanted everything, including what Trujillo had hidden in the backyard. Trujillo yelled back that he had already given defendant something and he was not going to give him any more. Cuevas heard a gunshot. He got out of the Blazer, looked through a window, and saw Trujillo lying on the floor with the front door wide open. Cuevas woke Zylla and they ran to the home of a neighbor, Jerry Messer. They told Messer that Trujillo had been shot. Birge, who also discovered Trujillo had been shot when he investigated the noise of defendant's car speeding down the street and saw Trujillo's open front door, drove up to Messer's house seeking help too.

Cuevas, Zylla, Birge, and Messer's friend, Gary Bekowsky, returned to Trujillo's house. The four of them went inside. Zylla got some towels for Bekowsky before she went outside to stay with Millstine, who was talking to 911 personnel. Birge also went outside to wave down responding officers. At some point before emergency crews arrived, Birge stripped down to his underwear because he knew he had dope in his pocket, he could not find it, and he did not want to be arrested. Birge admitted at trial that he had a .45-caliber gun in his truck that night.

Inside, Cuevas asked Trujillo who shot him, but Trujillo made no response. When Cuevas asked Trujillo if it was defendant, Trujillo nodded. As Bekowsky was trying to staunch Trujillo's bleeding with the towels, Cuevas reached over and grabbed a wad of blood-covered bills from Trujillo's shirt pocket. According to Cuevas, Trujillo owed him the money for his week's work, which he denied was dealing drugs for Trujillo.

When an ambulance arrived, Trujillo was taken to the hospital, where he was pronounced dead shortly after his arrival. He died from a single gunshot wound that entered his left shoulder in the back and exited his left upper chest. At Trujillo's house, a deformed bullet consistent with ammunition for a .44-caliber gun was found outside a window that had a bullet hole in it.

After interviewing witnesses at the scene, an alert was put out for defendant's El Camino. Sheriff's deputies spotted defendant's El Camino entering Highway 50 westbound near the Ponderosa Road overpass. The deputies followed the El Camino for several miles. When backup units arrived, they pulled the car over and arrested Henderson, who was the driver, and defendant, who was the passenger. In a field showup, Millstine identified defendant as the gunman. A search of the El Camino turned up some marijuana and methamphetamine in a case in the engine compartment. In the rear cargo area, deputies found a large plastic bag with numerous syringes.

Henderson testified pursuant to a plea agreement in which she pled guilty to first degree murder and was to receive a sentence of 14 years eight months in exchange for her testimony.[3] After describing the events leading up to the shooting, Henderson testified she began to have second thoughts while waiting in defendant's car. But before she could get to the house, defendant came out and got in the passenger seat of the car. He said, "[L]et's get the fuck out of here." Defendant said he was sorry and that he "shot him, it looks bad." As Henderson drove toward Highway 50, defendant gave her a plastic bag of methamphetamine that he said he had obtained from Trujillo. Henderson tried to conceal it. Defendant held the gun on his lap. When they noticed the sheriff's patrol car behind them, defendant threw the gun out of the passenger window.

At the jail, Henderson gave the bag of methamphetamine she had tried to conceal to an officer. She was placed in a holding cell with Amber Fairchild, whom she had known for several years. Henderson told Fairchild that Trujillo had been shot, that he was dead, and that she was being held for murder. When later housed in the same cell with Fairchild, Henderson told Fairchild she had procured the gun for their robbery of Trujillo and given it to defendant. The gun was thrown out the window and was somewhere along Highway 50. She asked Fairchild to retrieve it when Fairchild got out of jail.

The day after she got out of jail, Fairchild contacted law enforcement and, in a recorded conversation, gave them the information Henderson told her. She testified she came forward because she saw a newspaper clipping about

---

[3] After trial, the charge against Henderson was reduced from murder to voluntary manslaughter.

the shooting and she became concerned a young person could find the gun. She testified she did not receive anything for giving the information. Fairchild admitted suffering a felony conviction for spousal abuse in 2005 and a conviction for statutory rape in 2002.

Based on the information from Henderson, sheriff's deputies conducted a search for the gun along Highway 50. A .44-caliber revolver was found in some shrubs along the highway within a half-mile of the Ponderosa Road overpass. It contained five live rounds and one spent cartridge. A fingerprint that matched defendant's left index finger was found on the frame of the gun in front of the trigger guard.

In jail, Henderson also spoke with Jean Winters over a period of a couple of weeks. Henderson told Winters that Trujillo owed her money for taking the rap for him on a prior drug case and that she had decided to get what she was owed by robbing Trujillo of money and drugs. She obtained an untraceable gun from her friend Bobby Lee. Henderson told Winters that she and defendant went to Trujillo's house to rob him. When they got to the house, Henderson told Snyder about the planned robbery. Henderson gave Snyder a ride away from the house when Snyder did not want to participate. When she returned, Henderson checked Trujillo's house to see who was present. As she left the house, Henderson said defendant "struck [Trujillo] with a pipe." Henderson was going to go back and tell defendant to forget it, but then she heard a gunshot. She and defendant drove away in an El Camino. Henderson told Winters they got about an ounce of drugs from Trujillo and she tried to conceal it. Winters called her mother from jail and asked her to call police and report that Winters had information about this case. Winters later told El Dorado Sheriff's Detective Thomas Hoagland in a taped interview what Henderson had said.

Gunshot residue tests on swabs taken from defendant and Henderson after their arrest were inconclusive.

The defense sought to show Millstine misidentified defendant, the prosecution's witnesses were unreliable, and that either Cuevas or Birge might have committed the crime.

## DISCUSSION

### I.–VI.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 209.

## VII.

### Defendant Was Improperly Convicted of Three Separate Counts of Murder

■ Defendant claims he was improperly convicted of three separate counts of murder and that convictions on two of the three counts must be reversed. The People concede defendant can only stand convicted of one count of murder for his killing of Trujillo. We accept the People's concession.

■ Section 954 provides, in pertinent part, that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense . . . under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of *the offenses* charged . . . ." (Italics added.) "Thus multiple charges and multiple convictions can be based on a single criminal act, if the charges allege separate offenses." (*People v. Muhammad* (2007) 157 Cal.App.4th 484, 490 [68 Cal.Rptr.3d 695]; see *People v. Ryan* (2006) 138 Cal.App.4th 360, 368–369 [41 Cal.Rptr.3d 277].) Here, the three counts charged a single offense: murder. (§ 187, subd. (a).) The three counts simply alleged alternative theories of the offense.

The People suggest the appropriate remedy for this error is to consolidate the judgment to reflect one count of murder with two special circumstances and a finding of malice. The People note that in similar circumstances involving duplicative convictions, other courts have ordered that multiple counts be consolidated into a single judgment. (*People v. Scott* (1944) 24 Cal.2d 774, 777 [151 P.2d 517] (*Scott*) [ordered three counts of rape based on single act of intercourse consolidated into single judgment]; *People v. Craig* (1941) 17 Cal.2d 453, 459 [110 P.2d 403] [consolidating judgments and modifying the single judgment to state defendant was convicted of rape as charged in two counts]; *People v. Brown* (1948) 87 Cal.App.2d 281, 287 [196 P.2d 936] (*Brown*) [consolidating convictions for rape and a lesser included offense of assault with intent to commit rape].)

Defendant argues against consolidation. He distinguishes *Scott, supra*, 24 Cal.2d 774, and *Brown, supra*, 87 Cal.App.2d 281, as cases that did not increase the severity of a count for which the defendant had been tried and convicted. Defendant also claims consolidation would violate his due process right to notice of the charges against him.

Consolidation of defendant's convictions into a single count of murder with true findings on both special circumstances would not violate defendant's due process right to fair notice of the charges. This case is not like

*People v. Hernandez* (1988) 46 Cal.3d 194 [249 Cal.Rptr. 850, 757 P.2d 1013], cited by defendant. In *Hernandez,* the Supreme Court held that, as a matter of statutory interpretation and due process, a sentencing judge could not impose an additional three-year enhancement under section 667.8 (kidnapping for purposes of rape) when violation of that section was not pled or proved, but mentioned for the first time in a probation report. (*Hernandez, supra,* at p. 197.) Here, both special circumstances were charged in the second amended information. The jury made true findings on them both.

■ Nor is this case like *People v. Mancebo* (2002) 27 Cal.4th 735 [117 Cal.Rptr.2d 550, 41 P.3d 556], cited by defendant. In *Mancebo,* the Supreme Court held the trial court erred in sentencing when it used an unpled multiple-victim circumstance to support a sentence under the one strike law (§ 667.61) in order that a pled and proved gun use allegation could be used to impose additional sentence enhancements. (*Mancebo, supra,* at pp. 740, 743, 745, 754.) The Supreme Court stated "a defendant has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*Id.* at p. 747.) Here, defendant had notice of both of the special circumstances used to impose on him the indeterminate LWOP term. Each was pled and proved. In addition, each of the firearm enhancements used in sentencing defendant was pled and proved.

There is no due process violation in allowing the special circumstances and enhancements pled and found by the jury to be true to be retained in a consolidated single count of murder. To the contrary, consolidation preserves all of those jury findings, and does not increase the severity of defendant's sentence.

We shall vacate defendant's convictions of murder in counts II and III, together with the sentences imposed but stayed on those counts, and modify the judgment on count I to reflect defendant was convicted of murder with true findings on the special circumstances that the murder committed during the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)) and a burglary (§ 190.2, subd. (a)(17)(G)), plus true findings that defendant personally used a firearm in the commission of the offense (§§ 12022.5, subd. (a), 12022.53, subd. (b)) and that a principal was armed with a firearm in the commission of the offense (§ 12022, subd. (a)(1)). We decline the People's invitation to state an express finding of malice. It is sufficient that count I reflects an open count of murder.

## VIII.

## The Trial Court Erred in "Tripling" Defendant's Life Without Possibility of Parole Sentence

■ In *People v. Smithson* (2000) 79 Cal.App.4th 480 [94 Cal.Rptr.2d 170], this court held the plain language of section 667, subdivision (e)(1), a part of the three strikes law, permits doubling only "the determinate term or minimum term for an indeterminate term." (*Smithson, supra,* at p. 503, italics omitted; see *id.* at p. 504.) Since LWOP's are indeterminate terms with no minimum terms, they cannot be doubled under the three strikes law. (*Id.* at pp. 503–504.)

Defendant argues, and the People concede, the same rationale applies here for the language of section 667, subdivision (e)(2). We agree. The sentence on count I must be modified to impose a single indeterminate term of LWOP.

## IX.

## The Trial Court Erred in Imposing a Parole Revocation Fine[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment of conviction on count I is modified to reflect defendant was convicted of murder with true findings on the special circumstances that the murder was committed during the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)) and a burglary (§ 190.2, subd. (a)(17)(G)), plus true findings that defendant personally used a firearm in the commission of the offense (§§ 12022.5, subd. (a), 12022.53, subd. (b)) and that a principal was armed with a firearm in the commission of the offense (§ 12022, subd. (a)(1)). The portion of the sentence imposed on count I that imposed a triple indeterminate term of life without the possibility of parole is modified to reflect the imposition of a single indeterminate term of life without the possibility of parole. (§ 190.2, subd. (a).) The parole revocation fine (§ 1202.45) imposed on count I is stricken. Defendant's convictions of murder in counts II and III, together with the sentences imposed but stayed on those counts, are reversed and vacated. In all other respects, the judgment is affirmed.

---

[*]See footnote *ante,* page 209.

The trial court is directed to prepare an amended abstract of judgment and minute order to reflect the modifications on count I and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

Sims, Acting P. J., and Robie, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 13, 2010, S177807.