Filed 3/12/15  P. v. Torres CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>OSCAR PABLO TORRES,<br><br>  Defendant and Appellant. | F067249<br><br>(Super. Ct. No. 11CM3885F)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tarter, Judge.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Oscar Pablo Torres was convicted by jury of attempted premeditated murder (Pen. Code,[1] §§ 664, 187, subd. (a)), assault with a deadly weapon (§ 245, subd.

---

[1]All further references are to the Penal Code unless otherwise indicated.

(a)(1)), assault by means of force likely to produce great bodily injury (former § 245, subd. (a)(1)), and being an active participant in a criminal street gang (§ 186.22, subd. (a)). In addition, the jury found true special allegations that defendant committed his crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and he personally inflicted great bodily injury upon the victim. The trial court subsequently sentenced defendant to a total term of 18 years to life in prison.

On appeal, defendant contends the evidence was insufficient to support the findings he personally inflicted great bodily injury upon the victim and his gang engaged in a pattern of criminal gang activity. We find the evidence was sufficient to support the verdicts. In addition, defendant claims his conviction for assault by means of force likely to produce great bodily injury must be vacated because the conviction was based on a separate theory, not a separate act, of the assault with a deadly weapon charge. We agree with this contention and will vacate his conviction on count 3.

**FACTS**

On December 4, 2011, Kings County Sheriff's Deputy Matthew Washburn responded to the report of a stabbing at the Tachi Palace gaming casino in Lemoore. He arrived at approximately 5:10 a.m. He discovered the victim Jaime Ocegueda being attended to by emergency personnel just outside the main entrance to the casino. The victim was airlifted to a hospital as a result of his injuries. Sergeant Charles Buhl also responded to the scene, and medical personnel informed him the victim had sustained life-threatening injuries. Detective Robert Balderama subsequently went to the hospital where the victim was being treated. He observed the victim had a bump on his head, a puncture wound to his chest above his right nipple, and a cut to his chest below the right armpit along his ribcage. Additionally, he had a cut to his left shoulder.

Deputy Christopher Fernandes assisted in the investigation regarding the stabbing. While in route to the scene, Fernandes observed four individuals walking a few miles from the casino. The group consisted of Eduardo Mata, Javier Talavera, defendant, and Sandra Lopez. Because the individuals seemed to match the descriptions he had received

2.

of persons of interest in the stabbing, he stopped the group and detained them. When he ordered the group to stop, he saw Mata discard a nonworking cell phone and Talavera throw a Houston Astros baseball cap. Five additional males were detained at the casino. The detained men included Miguel Vasquez, Eric Medina, Teodoro Mata Penaloza,[2] Angel Rodriguez, and Johnny DeLeon.

The Tachi Palace has a security system consisting of a few hundred security cameras. The video is recorded and has a time and date stamp. The video was provided to law enforcement regarding the date and time in question and was ultimately admitted into evidence during the trial. The surveillance video captured defendant along with some of the others involved entering the casino, walking through the casino, and entering an elevator. It also captured portions of the assault.

Specifically, defendant can be seen entering the casino at 3:51 a.m. on the date in question. Less than a minute later, Rodriguez, Mata, and Talavera are seen entering the casino. Video from inside the casino depicted defendant wearing black pants, a red shirt, and a plaid Pendleton over the shirt. Defendant was the only person of the nine people arrested that evening wearing a plaid top and black pants.[3]

Defendant can be seen congregating with Vasquez, Lopez, Mata, Talavera, and DeLeon inside the casino. Subsequently, defendant is seen entering an elevator with several others, and Talavera is holding open the doors. While defendant and several others are in the elevator, two people approach and appear to be conversing with the people in the elevator. Shortly thereafter, the victim and his girlfriend can be seen walking by the elevator and toward the main entrance. Within seconds, the group inside the elevator, including defendant, exit and also walk toward the main entrance. Lopez and Mata are seen looking in the direction of the main entrance and appear to be

---

[2]Although Tedoro Mata Penaloza was referred to as Mata during the trial, we will refer to him as Penaloza to avoid confusion with Eduardo Mata.

[3]While Medina also wore a plaid shirt, he had on light colored pants.

watching something. The next video depicted the main foyer and the victim and his girlfriend are observed leaving followed by defendant and several others.

Part of the altercation was captured on video. According to Fernandes, the video showed the victim being attacked by a group of four or five males. The video depicted the main foyer, which led outside through automatic sliding doors. Although the assault took place outside, portions could be seen through the open doors. Initially, there appeared to be an altercation and then the victim is seen standing on the steps to the main entrance. An additional assault takes place where the victim is knocked to the ground between the sliding doors. His girlfriend falls on top of him then Talavera can be seen standing over the victim, punching him. Fernandes testified he was able to recognize defendant, Talavera, DeLeon, and Mata on the video. Lopez is seen on the video but did not appear to be involved in the attack.

An outside camera pointed at the stairs leading to the main entrance also captured the assault, however, due to the lighting it is difficult to make out the individuals. According to Fernandes, defendant is seen participating in the assault. Fernandes testified he could see defendant get knocked down at one point during the altercation. Video from a camera depicting the stairs to the main entry showed defendant and the others leaving the area.

Noemi Molina is the mother of the victim's child. On the day in question, she, the victim, and a friend, Adrian, went to the casino. Although she admitted the victim was stabbed that night, she claimed to not remember anything about the stabbing. She denied having any knowledge about gangs or being associated with a gang.

Deputy David Morrell spoke to Molina on the night of the stabbing and testified regarding statements she made to him that evening. Molina stated she and the victim had been at the casino for approximately 10 minutes when she said she wanted to step outside because the cigarette smoke was bothering her. As they were walking outside, some Hispanic males began making gang references, saying "north side" toward the victim. Subsequently, the men attacked the victim, eventually knocking him to the ground. Once

4.

on the ground, the attack continued. She attempted to pull some of the attackers away from the victim, but was unable to do so. She did not see any weapons during the attack. At one point, one of the attackers said they needed to flee before the police arrived and they left. When Molina checked on the victim, she discovered he had been stabbed.

While at the casino, Molina viewed several of the detained subjects to determine if they were involved in the attack. She identified several men as being involved in the attack, including Rodriguez, Vasquez, and Mata who all kicked the victim while he was on the ground. She noted she tried to push Mata away from the victim during the attack. Additionally, she identified DeLeon as one of the men kicking the victim while he was on the ground and also as the person who had yelled "north side" earlier. Talavera pushed the victim to the ground and hit and kicked him while he was down. Molina identified defendant as being present during the attack, however, she did not recall his involvement. Lopez was also present but had no involvement in the fight. She did not identify Medina or Penaloza as being involved in the attack.

Sandra Lopez testified pursuant to an agreement with the district attorney's office. She was initially charged with attempted murder and a gang enhancement but was allowed to plea to accessory after the fact in exchange for her truthful testimony. She had gone to the casino with Vasquez and eventually met up with the other men who were detained that night. Some of the men in the group were asking other people if they "banged" and where they were from. She noted DeLeon was flashing a gang tattoo that said "Fres Norte."

At one point during the evening, Lopez was in the elevator with approximately five of the men while two others held the elevator doors open. They got out of the elevator and the men began arguing with the victim. She recalled at least five of the men punching the victim, but she could not specifically remember who was involved in the fight. She testified DeLeon stood over the victim and punched him while he was on the ground. Talavera, Mata, and defendant were punching the victim while he was still standing. She testified defendant did not punch the victim more than twice. She did not

5.

see defendant stab anyone, however, she did look away during the fight. She claimed Vasquez was not involved in the attack. The fight lasted about two minutes.

Afterwards she left with Mata, Talavera, and defendant. She believed all three had been involved in the fight. As they were walking, she heard the men discussing how they had beat up the victim. Shortly before they were stopped by the police, defendant gave her a knife. Lopez had secreted the knife in her boot, but the deputies later recovered it when they observed her while she was in an interview room remove the knife from her boot and place it inside her pants. She told the deputies defendant had given her the knife, but only described him by his clothing, not by name, as she did not know his name that evening. When opened, the knife measured a total of approximately eight inches and had a three-inch blade. Subsequent testing of the knife revealed the presence of the victim's blood on the blade.

Fernandes interviewed defendant after he was arrested. After being informed of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 and agreeing to speak with the officer, defendant initially stated he did not have anything to do with the assault. Defendant then admitted his involvement, stating at one point he was pushed into the fight, that the victim's girlfriend grabbed him and he shook her off, and that he kicked the victim one time while he was on the ground. When asked if he was expected to do something when his "homeboys" got into a fight, defendant replied he had to get involved.

Defendant and the others were arrested approximately two and a half to three miles from the casino. Defendant claimed he did not speak with the others about the assault afterwards, even though they walked together for a few miles. Defendant denied ever touching a knife or giving a knife to Lopez. Defendant said he had been in the Norteño gang for four years. When asked about his "DC" tattoo, defendant initially said it stood for Dallas Cowboys, but later affirmed it also meant Devil's Colony.

***Gang Evidence***

Officer Chris Martinez of the Avenal Police Department testified as a gang expert. He previously working for the Parlier Police Department. Martinez explained the gangs in Parlier and Avenal operate with the same symbols, colors, tattoos, culture, and philosophy. Martinez is familiar with the Nuestra Familia, a prison gang that associates with the color red. The Norteños fall underneath the Nuestra Familia and tend to occupy the part of California north of Bakersfield. Their primary rival is the Sureño gang.

The Norteño gang associates with the numbers 1 and 4, the letter N and the color red. Additionally, the gang uses various symbols to represent the number 14. The number 14 is significant to the gang because it represents the letter N, the 14th letter of the alphabet. The letter N also represents the Nuestra Familia. "Norte" is short for Norteño. The Norteño gang is primarily composed of Hispanics.

There are 126 documented Norteño gang members in Parlier. There are two gangs in particular that identify with the Norteños in Parlier, the Varrio Colonia Parlier Norte (VCPN) and the Devil's Colony (DC). They are both part of the Norteño structure and considered subsets of the Norteño gang, and members of the two gangs generally associate with each other. Subsets are usually identified with a particular geographical area.

The DC subset originated in approximately 2008 and the founding members were defendant, Mata, and Vasquez. The VCPN and DC share common primary activities, such as fighting, possessing and concealing weapons, transporting drugs for possession and sale, and assaulting other gang members with weapons. The two gangs share common rivals, specifically the Sureños and Bull Dogs. Both the VCPN and DC are violent gangs. Martinez based this opinion on two stabbings he personally investigated. The primary violent activity of these gangs is stabbings. In most of the stabbing situations, five to ten Norteños confront a lone rival gang member.

VCPN is directly related to the Nuestra Familia. Martinez previously encountered a gang member attempting to destroy a document containing the "14 bonds," which is

part of the Nuestra Familia constitution. Martinez described the 14 bonds as instructions regarding how the members are to conduct themselves. One of these rules of conduct relates to weakness, instructing members not to show weakness or cowardice. Backing down from a rival gang member or not participating in a fight would be considered weak. Members of the gangs in Parlier terrorize the public and rival gang members. Lifting one's shirt to display a gang tattoo is a way of proclaiming gang affiliation. Likewise, asking where someone is from is generally done when a gang member suspects someone else is a member of a rival gang.

Members advance within the gang (earning stripes) by committing violent crimes. If a group of Norteños encounters a Sureño who talks back to them, they are expected to attack. The use of violence gains a person respect within the gang. A snitch is someone who reports a crime, testifies in court, or otherwise cooperates with law enforcement. A snitch can suffer severe repercussions, from being beaten to being killed.

Evidence was admitted regarding the clothing and tattoos of Medina, Vasquez, Penaloza, Rodriguez, DeLeon, Talavera, and Mata indicating their association with the Norteño gang. The evidence established defendant had several tattoos, including North Side on his chest, the numerals 1 (right) and 4 (left) on his shoulders, 559 on his right arm, DC on his left arm, and "these secrets" on his right hand. Furthermore, on the night of the incident he was wearing a red T-shirt and a belt with a red star.

Martinez reviewed the law enforcement contacts, tattoos, photographs, admissions and other evidence of the men who were detained after the assault. Martinez opined Medina is a member of the VCPN in Parlier, Vasquez is a member of the DC, Penaloza is a member of both the DC and the VCPN, Mata is a member of the VCPN, and Rodriguez is a member of the VCPN. Talavera previously admitted membership in the Norteño gang, had gang-related tattoos including VCPN, had been observed in gang attire and in association with gang members, and was involved in a gang-related assault.

Martinez also reviewed defendant's law enforcement contacts, including (1) an incident where he was stabbed by a rival gang member, (2) his association with other

gang members, (3) observations of him wearing gang attire, (4) his admission of gang membership, (5) a photograph of defendant along with other gang members where defendant is making a gang sign with his hands, and (6) his tattoos, including a five-point star on his right arm, North Side on his chest, the numerals 1 and 4 on his shoulders, 559 on his right arm, and DC on his left arm. He noted defendant was one of the founding members of the DC gang.

Deputy Kevin Smyres also testified as a gang expert. Smyres testified Salvador Zamora and Paul Hernandez committed a home invasion robbery with a firearm in 2010 and were both sentenced to prison. Both are documented Brown Pride Norteño gang members. The Brown Pride Norteño gang is a subset of the Norteño street gang, specifically within the area of Lemoore. Zamora had seven gang-related contacts with law enforcement and he admitted to being a Brown Pride Norteño. In Smyres opinion, Zamora was a member of the gang at the time of the commission of his offense.

Hernandez was convicted of first degree burglary and conspiracy to sell methamphetamine in 2010. Hernandez had a total of 11 gang-related contacts with law enforcement that Smyres reviewed and, based upon that review, opined Hernandez was an active participant in the Brown Pride Norteño street gang at the time of the commission of his offense.

Nicholas Mejia Sumaya had 12 gang-related contacts with law enforcement and was convicted of a felony assault of a Sureño gang member in 2008. Sumaya admitted membership in the South Side Locs gang, a Norteño gang in Hanford.

Smyres opined the stabbing of the victim at the casino was done for the benefit of the Norteño gang by gaining respect from a rival gang as well as the general public. Consistent with the Norteño gang structure, Norteño gang members increase their respect level through participating in violent acts. The attack on the victim increased the respect for the Norteños as a whole as well as for the VCPN and the DC.

Further, he opined the stabbing was done in association with the Norteño criminal street gang because the assailants were all Norteño gang members due to their clothing,

9.

tattoos, actions, and group association. Specifically, taking actions such as displaying tattoos and wearing red clothing in association with the attack demonstrated the gang purpose. In addition, in Smyres opinion, the victim was a member of the Sureño street gang. He based this opinion on the fact the victim had a tattoo of three dots on the web of his hand, advertising his gang membership.

### Defense Case

Defendant, a resident of Parlier, admitted going with Rodriguez, Talavera, Mata, and Medina to the Tachi Palace casino in Lemoore on the night in question. He admitted he was a member of the DC, but claimed none of the others were members of the gang. He denied knowing Lopez, claiming he first saw her was night of the incident and he did not speak to her that evening.

At one point during the evening, defendant was in the elevator and saw Lopez and Mata enter. Then defendant's friends exited, so he followed them thinking they had decided to leave. He walked outside and saw the victim and DeLeon fighting. Then he saw Talavera get involved. Defendant claimed he did not know why the fight broke out. After defendant walked outside, the victim immediately hit him in the face and in response, defendant kicked him once. The victim was standing at the time. Then the victim's girlfriend grabbed him and told him to leave the victim alone. The only involvement defendant claimed to have had in the fight was when he kicked the victim in the leg. Defendant denied he was the person in the video who got knocked down. Defendant denied any knowledge the victim had been stabbed and testified he did not provide anyone with a knife. Specifically, he stated he did not give a knife to Lopez. After he kicked the victim, defendant began looking for his friend who had brought him to the casino. He ran to the parking lot to look for his friend's car. He ran because he did not want to be held responsible for the fight. Defendant was unable find his friend and instead followed Talavera, Mata, and Lopez as they began walking away from the area. Defendant did not talk to the group because he was angry about what had happened.

10.

Later they were stopped by the police. Defendant denied discarding anything when the officer stopped them.

Defendant claimed that although he is a gang member, he is not required to help fellow gang members who are involved in a fight, and his failure to help is not viewed as cowardice within the gang. Defendant admitted he is a member of the DC gang and therefore a part of the Norteño gang. Defendant admitted on cross-examination that the people he was with at the casino were all Norteño gang members with the exception of Medina. He claimed his DC tattoo referred to Dallas Cowboys.

## DISCUSSION

**I.    The Evidence Is Sufficient to Support the Enhancement for Personal Infliction of Great Bodily Injury**

Defendant argues the evidence is insufficient to support the great bodily injury enhancement. The court instructed the jury with the group beating instruction. (CALCRIM No. 3160.) Defendant seems to contend the instruction was unsupported as it was not impossible to determine who inflicted the victim's injuries. We conclude the evidence was sufficient to support the instruction and the jury's findings.

When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Further, we review

> "the evidence in the light most favorable to the prosecution, [asking whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

11.

"Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

"Whether the evidence presented at trial is direct or circumstantial, … the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Towler* (1982) 31 Cal.3d 105, 119.)

> "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.] "'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'" [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

"Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).) The phrase "personally inflicts" means that the defendant himself must have personally and directly inflicted the injury. (*People v. Cole* (1982) 31 Cal.3d 568, 572, 579.) Great bodily injury requires a significant or substantial physical injury; an insignificant or trivial injury does not suffice. (§ 12022.7, subd. (f); *People v. Martinez* (1985) 171 Cal.App.3d 727, 735; *People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.)

The evidence at trial established the victim suffered three separate stab wounds, requiring him to be airlifted to the hospital. Thus, there is ample evidence the victim in fact suffered great bodily injury. Defendant does not dispute this finding; rather, he claims the evidence was insufficient to prove he personally inflicted the injury. He bases

his argument upon the premise the video surveillance established it was Talavera who caused the stab wounds, not defendant. He claims the video surveillance shows Talavera stabbing the victim and later leaving the area while folding up a knife and putting it in his pocket.

We disagree with defendant's interpretation of the evidence. Due to the lighting, it is very difficult to view exactly what happened during the attack on the victim. Defendant can be seen exiting the casino, and movements indicating an attack can be seen from the different camera angles. Defendant correctly contends someone other than defendant can be seen in one video punching the victim while he is on the ground. Based on this circumstance, he contends it is impossible to determine who inflicted the stab wounds. We disagree.

The evidence is sufficient to establish defendant was involved in the fight. Indeed, Lopez testified defendant punched the victim outside, but did not do so more than two times. Additionally she testified defendant gave her a folding knife shortly after the attack as they were walking back to town, and she concealed it in her boot. Officers later discovered the knife and seized it. Analysis of the knife revealed the victim's blood on the blade. The evidence established the victim suffered three separate stab wounds to his torso.

From the above evidence, the jury could conclude defendant stabbed the victim at least once when he was observed punching the victim, resulting in one of the three cuts to the victim's torso. Although defendant denied punching or stabbing the victim or possessing the knife at any point in time, the jury was free to disbelieve his testimony. The jury could have likewise concluded Talavera stabbed the victim one or more times. However, it was impossible to tell from the evidence who inflicted which stab wound and which stab wound, either alone or in combination, caused the great bodily injury.

Given the fact defendant was observed punching the victim and was in possession of a knife containing the victim's blood, the jury could certainly determine defendant

13.

personally inflicted one or more of the stab wounds to the victim.[4]  Because there was also evidence from which it could infer another member of the group also inflicted a stab wound, it could find it was impossible to determine who inflicted each wound.  When it is unclear which of multiple assailants actually caused a great bodily injury, an enhancement may be imposed on each of the assailants who used force substantial enough, either alone or in combination, to have caused the injury.  (*People v. Modiri* (2006) 39 Cal.4th 481, 486, 494, 496–497; accord, *People v. Dunkerson* (2007) 155 Cal.App.4th 1413, 1418; *People v. Corona* (1989) 213 Cal.App.3d 589, 594.)

In *People v. Banuelos* (2003) 106 Cal.App.4th 1332, the court upheld the giving of a group beating instruction where the evidence established the defendant along with eight others attacked the victim, causing severe cuts to his head and a broken jaw.  The evidence demonstrated the defendant struck the victim in the jaw with a bat, but there was additional evidence that further established other blunt instruments were used in the attack.  There was also testimony that it was impossible to tell if the victim's broken jaw was caused by the bat or by one of the other blunt instruments.  (*Id*. at pp. 1334-1335, 1338.)  The court explained the jury could reasonably conclude it was impossible to trace the victim's injuries to any specific blow.  (*Id*. at p. 1338.)

---

[4]Defendant argues in his reply brief that the People are "precluded on appeal from raising a different theory of criminal liability than the theory raised by the prosecution in the trial court." Defendant relies upon *People v. Miller* (2007) 146 Cal.App.4th 545, 551 for this proposition. *Miller* is inapposite.  *Miller* dealt with whether the appellate court should remand a case to the trial court after the denial of a motion to suppress where the only issue to be litigated on remand was one that was foreclosed by the facts as testified or conceded by the prosecution at the start of the hearing.  Under such circumstances it would be "plainly unfair to allow [the People] to relitigate the issue." (*Ibid*.)  Unlike *Miller*, the People are not seeking to present additional evidence on the matter.  The question here is whether the jury was presented with evidence supporting the conclusion defendant was the actual stabber.  When reviewing the sufficiency of the evidence, we review all the evidence in the light most favorable to the prosecution to determine whether there was evidence from which the jury could reach its verdict.  (*In re Jerry M*., *supra*, 59 Cal.App.4th at p. 298.)  The jury was instructed it could find the great bodily injury enhancement true if it found defendant personally inflicted the injury.  As the jury was presented with evidence and instructions supporting this theory at trial, we may review the evidence on appeal.

14.

Likewise here, there was evidence defendant was observed punching the victim, and he was in possession of a knife stained with the victim's blood shortly after the assault. There was additional evidence through the video surveillance that someone other than defendant made stabbing motions toward the victim while he was on the ground. Given this evidence, and the fact the victim suffered a total of three stab wounds, the jury could reasonably determine it was impossible to conclude which wound was inflicted by which blow. By its terms, the challenged instruction applied only if the jury found more than one person assaulted the victim, but the jury could not determine which person caused which injury. We presume the jury understood and properly applied the instruction. (*People v. Homick* (2012) 55 Cal.4th 816, 861.)

## II.     Sufficient Evidence Supported Defendant's Convictions of Active Participation in a Criminal Street Gang and the Gang Enhancement

Defendant argues the evidence was insufficient to show the DC or VCPN constituted a criminal street gang because there was no evidence to establish members of the gang engaged in the requisite predicate acts. He claims the predicate acts were committed by members of different gangs—the Brown Pride Norteños and South Side Locs—and the acts were therefore insufficient to qualify as predicates for defendant's gang. We find defendant's argument unpersuasive.

In evaluating a claim the evidence is insufficient to support the verdict, we review "'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.) We review the evidence in favor of the judgment and will uphold the judgment as long as the circumstances reasonably justify the jury's findings. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.) "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of

15.

fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer*, *supra*, 19 Cal.App.4th at p. 1765.)

Section 186.22, subdivision (a) criminalizes the active participation in a "criminal street gang" with knowledge that its members engage in "a pattern of criminal gang activity" and who willfully promotes, furthers or assists gang members in felonious criminal conduct.  Likewise, section 186.22, subdivision (b)(1) provides for increased punishment for any person who is convicted of a felony that is "'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)

The term "criminal street gang" is defined in subdivision (f) of section 186.22:

> "As used in this chapter, 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

The term "pattern of criminal gang activity" is defined in subdivision (e) of section 186.22:

> "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [33 enumerated crimes], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."

Defendant's argument on appeal is limited to the lack of evidence at trial demonstrating the predicate acts presented were committed by members of his gang. Defendant does not contend the predicate acts proven at trial were insufficient to demonstrate a pattern of criminal gang activity as defined in section 186.22, subdivision

16.

(e), or that any other element required by section 186.22, subdivision (a) or (b) was lacking.  Thus, we will confine our discussion to the issue raised by defendant.

Defendant relies heavily upon this court's prior opinion in *People v. Williams* (2008) 167 Cal.App.4th 983 (*Williams*) in making his argument.  As we will explain, *Williams* is distinguishable.  There, the defendant was convicted of murder (§ 187, subd. (a)) and the substantive offense of active participation in a criminal street gang in violation of section 186.22, subdivision (a), and the court found true a gang-related special circumstance allegation (§ 190.2, subd. (a)(22)).  On appeal, we addressed the issue of "the relationship that must exist before a smaller group can be considered a part of a larger group for purposes of determining whether the smaller group constitutes a criminal street gang." (*Williams*, *supra*, 167 Cal.App.4th at p. 985.)  The prosecution presented evidence of a larger group known as the Peckerwoods, and a smaller group known as the Small Town Peckerwoods (STP).  Specifically, an expert witness opined the Peckerwoods qualified as a criminal street gang and that smaller groups, such as the STP, "are all factions of the Peckerwood organization." (*Id*. at p. 988.)  While the expert testified the Peckerwoods shared a White pride or White supremacist ideology, he explained the group was not "organized like other criminal street gangs …:  for the most part, they have no constitution, and are a looser organization with a less well-defined rank structure." (*Ibid*.)  The defendant argued that although there was evidence he was an active participant in the smaller group, "there was insufficient evidence of a connection between members of the Small Town Peckerwoods and [the larger group]." (*Id*. at p. 987.)

This court agreed with the defendant and held that in considering whether the criminal street gang element of the offense had been established, the trier of fact could not consider evidence relating to the larger Peckerwoods group because the People had not established a sufficient connection between the smaller group and the larger group.

> "[S]omething more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street

17.

gang. Instead, some sort of collaborative activities or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization.… On the record before us, however, it would be speculative to infer that the Small Town Peckerwoods and greater Peckerwood gang shared more than an ideology ….” (*Williams, supra,* 167 Cal.App.4th at pp. 988-989, fn. omitted.)

*Williams* is inapposite. As indicated above, the issue there was whether it could be established that the *smaller group* was a criminal street gang based on the extent of its connection with the larger group.[5] (*Williams*, *supra*, 167 Cal.App.4th at p. 985 [“we … address the relationship that must exist before a smaller group can be considered a part of a larger group for purposes of determining whether the smaller group constitutes a criminal street gang”].) That issue is not before us here; we need not decide whether the smaller group—the DC or VCPN—qualified as a criminal street gang in its own right because regardless of what the evidence established regarding the status of those groups, the evidence was sufficient to establish that the Norteños are a criminal street gang.

At trial, it was apparent the prosecution argued defendant was a member of the Norteño gang, as well as a member of the DC and VCPN, which are subsets of the greater Norteño gang. Indeed, at trial, Martinez testified regarding the organization, colors and symbols of the *Norteño* gang. Specifically, the Norteño gang associates with the numbers 1 and 4, the letter “N,” the 14th letter of the alphabet, various symbols representing the number “14,” the color red, and a five-point star. The primary rival of the Norteños is the Sureño gang. The gang is primarily composed of Hispanics and generally occupies the northern part of the state. He noted there were 126 documented *Norteño* gang members in the city of Parlier. The Norteño gang is directly under the Nuestra Familia and follows its code of conduct.

---

[5]We note the issue of whether there must be a collaborative or organizational nexus before multiple subsets of a gang can be treated as a whole is currently pending before the California Supreme Court in *People v. Prunty*, review granted June 26, 2013, S210234.

The DC and VCPN are subsets and part of the Norteño gang. Martinez described a subset as part of the gang that identified with a particular geographical area. Defendant admitted membership in the Norteño gang, had prior law enforcement contacts with other Norteño gang members, was observed wearing Norteño gang colors, and had tattoos related to the Norteño gang. Additionally Martinez had reviewed a photograph of defendant together with other known gang members where he was making a hand signal of the letter "N," a sign for the Norteño gang.

Smyres opined the stabbing was done for the benefit of the Norteño gang, and the actions in this case were consistent with the Norteño structure. During the assault, defendant was seen wearing a red T-shirt. The victim was a Sureño gang member, a rival of the Norteños. Defendant admitted his membership in both the DC and the Norteño gangs and further admitted the men he was with that night were all members of the Norteño gang with the exception of Medina. In closing argument, the People argued defendant was a member of the Norteño gang, and as such the People were required to prove the Norteños constituted a criminal street gang. From the foregoing evidence, it is clear the criminal street gang at issue is the Norteños, not the DC or VCPN as defendant asserts.

As we recognized in *Williams*, "[e]vidence of gang activity and culture need not necessarily be specific to a particular local street gang as opposed to the larger organization." (*Williams*, *supra*, 167 Cal.App.4th at p. 987.) And in *People v. Ortega* (2006) 145 Cal.App.4th 1344 the court concluded the People were not required to prove which subset of the Norteños committed the charged offenses:

> "We reject defendant's assertion that the prosecution had to prove precisely which subset was involved in the present case. No evidence indicated the goals and activities of a particular subset were not shared by the others. There was sufficient evidence that Norteño was a criminal street gang, that the murder was related to activity of that gang, and defendant actively participated in that gang. There is no further requirement that the prosecution prove which particular subset was involved here." (*People v. Ortega*, *supra*, 145 Cal.App.4th at pp. 1356-1357; see *In re Jose P.* (2003) 106 Cal.App.4th 458, 467-468.)

19.

Thus, the question presented on appeal is whether the People proved members of the Norteño gang committed the required predicate offenses. On this issue, the People presented evidence that Paul Hernandez was convicted of first degree burglary in 2010. In addition, Salvador Zamora was convicted of a home invasion robbery in 2010 with Hernandez. Both Hernandez and Zamora had numerous law enforcement contacts that Smyres reviewed in forming his opinion. Based upon his review of the documentation, he opined both Hernandez and Zamora were members of the Brown Pride Norteños which is a subset of the greater Norteño gang. Furthermore, the evidence established Nicholas Mejia Sumaya was convicted of an assault with a deadly weapon upon a Sureño gang member in 2008. During the assault, Sumaya yelled, "'who are you scrap'" and "'Norte.'" Smyres reviewed Sumaya's 12 prior gang-related contacts with law enforcement and opined Sumaya was an active member of the South Side Locs, a subset of the Norteño gang in Hanford. Thus, the evidence established that members of the Norteño gang had engaged in a "pattern of criminal gang activity."

To the extent defendant argues there was insufficient evidence linking the Brown Pride Norteños and South Side Locs to the greater Norteño gang, we reject the claim. As indicated above, such a relationship is established if the two groups have "some sort of … collective organizational structure" from which the requisite "overall organization" is "inferable." (*Williams*, *supra*, 167 Cal.App.4th at pp. 988-989) The testimony of Officer Martinez and Deputy Smyres established the subsets of the Norteños operated under a unified structure. The Norteño gang operated under a constitution containing the "14 bonds" that provides how those within the gang are to conduct themselves. Norteño subsets are identified with a particular geographical area. The Brown Pride Norteños are a subset of the Norteño street gang that identifies with the area of Lemoore and Stratford. Likewise, the South Side Locs is a subset of the Norteño gang located in Hanford.

The facts underlying Sumaya's conviction further demonstrate the subset was a part of the larger gang. Smyres testified Sumaya was convicted of assaulting a Sureño gang member, the primary rival to the Norteños, and during the attack he used the

20.

derogatory term "scrap." In addition, he used the term "Norte" which, as the testimony established, is short for Norteño. From the evidence as a whole, the jury could infer Hernandez, Zamora, and Sumaya were all active Norteño gang members. Thus, the evidence is sufficient to demonstrate the Norteños constitute a criminal street gang within the meaning of section 186.22. Therefore, we reject defendant's claim.

### III. Count 3 Must Be Stricken

Defendant contends, and the People concede, his conviction on count 3, assault by means of force likely to produce great bodily injury must be vacated because it is a different theory not a separate offense of assault with a deadly weapon. We agree.

Section 954 provides "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense …, under separate counts" and the "prosecution is not required to elect between the different … counts set forth in the accusatory pleading." However, a defendant may not be convicted of multiple counts of the same offense for the same act pursuant to section 954. (*People v. Coyle* (2009) 178 Cal.App.4th 209, 217.)

At the time defendant committed the offense, former section 245, subdivision (a)(1) provided as relevant here: "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years."[6] (Stats. 2004, ch. 494, § 1.)

The People concede the conduct at issue constituted a single assault that was tried on two separate theories: assault with a deadly weapon and assault by means of force likely to produce great bodily injury. Indeed, as our Supreme Court has recognized, former section 245, subdivision (a)(1) states a single offense under two different theories. (*In re Mosley* (1970) 1 Cal.3d 913, 919, fn. 5; see *People v. McGee* (1993) 15

---

[6]Effective January 1, 2012, section 245 was amended to provide for the offense of assault with a deadly weapon in subdivision (a)(1) and the offense of assault by means of force likely to produce great bodily injury in subdivision (a)(4).

Cal.App.4th 107, 114-117 [former § 245, subd. (a)(1) states a single offense].)  As counts 2 and 3 stated different theories for the same offense, the appropriate remedy is to vacate one count.  (*People v. Coyle*, *supra*, 178 Cal.App.4th at pp. 217-218.)

## DISPOSITION

The conviction on count 3, assault by means of force likely to produce great bodily injury (former § 245, subd. (a)(1)) is vacated.  The personal infliction of great bodily injury enhancement (§ 12022.7) attached to count 3 is also vacated.  The trial court is directed to prepare an amended abstract of judgment and to forward a copy to the Department of Corrections and Rehabilitation.  The remaining counts and allegations are unaffected by this order.  In all other respects, the judgment is affirmed.

 

_____

PEÑA, J.

WE CONCUR

 

_____

LEVY, Acting P.J.

 

_____

SMITH, J.