Filed 1/18/23  P. v. Salazar CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAFAEL ROBERT SALAZAR,<br><br>    Defendant and Appellant. | B315866<br><br>(Los Angeles County<br>Super. Ct. No. KA121755) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Rogelio G. Delgado, Judge.  Affirmed as modified.

        Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Rafael Salazar of various sex offenses against a child.  On appeal, he contends that the trial court improperly admitted evidence of a prior sex offense and of Child Sexual Abuse Accommodation Syndrome (CSAAS), the prosecutor committed prejudicial misconduct, and there are sentencing errors.  We modify the judgment to correct sentencing errors, reject Salazar's remaining contentions, and affirm the judgment as modified.

## BACKGROUND

I.      Evidence of the sexual assaults

At Salazar's trial, the victim Isabella M. testified that she was three years old when her mother and Salazar began dating.[1]  He became like a father to Isabella.  Salazar sexually assaulted Isabella twice when she was a child.  The first incident occurred when Isabella was nine years old.  While she was cleaning the bathroom, Salazar came in, undid his belt and boxers, and pulled out his penis.  He grabbed Isabella's hair, forced her to her knees, and pushed her head towards his penis.  She bit his penis.  It felt "weird," and she wanted it to be over.  Salazar made Isabella orally copulate him.  Isabella tasted something sour in her mouth, and she swallowed some of it and spat some of it out.  Isabella did not tell her mother what happened.  When Isabella told Salazar that she was going to tell her mother, Salazar acted like he was going to slap her but didn't and said she had better not tell.

The second assault happened when Isabella was 10 years old.  She and Salazar were arguing in the living room.  Isabella called him a "bitch," and Salazar pushed her onto a futon, got on

---

[1]      At trial, Isabella was 14 years old.

top of her, and pulled down her leggings. Although Isabella kicked at him and told him to stop, he inserted his penis into her vagina and touched her breasts under her shirt. She kicked at him, and his penis slipped out. Isabella ran to the bathroom, where she stayed until her mother came home. Not knowing how to tell her mother, she said nothing.

Isabella did not tell anyone about the assaults until she was 12 years old, when she told her older sister, Preciosa. By this time, Salazar had moved out of the house. According to Preciosa, Isabella had been behaving badly and had gotten uncharacteristically bad grades, so Preciosa knew something was wrong. One day in the summer of 2019, the sisters were arguing, and Preciosa asked Isabella what was wrong. Isabella told Preciosa that Salazar had violated her. Isabella said that Salazar tried to force her to orally copulate him, but she bit his penis. Isabella denied that she and Salazar had intercourse. According to Isabella, she only told Preciosa about the first incident in the bathroom but not about second one on the futon because it was too hard to talk about the second incident.[2]

Preciosa immediately told their mother about what Isabella had said, and their mother called the police. At a forensic interview, Isabella said that during the bathroom incident she tried to choke Salazar, but he grabbed her hands and bent them, hurting her. He forced her head down, and although she bit his penis, he didn't stop. She also told the interviewer about the second incident, saying he spread her legs and "put it inside of"

---

[2]    Isabella testified that after she told Preciosa about Salazar, Isabella told a friend that she had been touched when she was a kid.

3

her. She had thought choking might weaken him, but it didn't do anything. Isabella said that Salazar was "like pushing my hands down on my legs."

## II. Evidence that Salazar had previously committed a sex offense

The trial court admitted evidence that Salazar committed a prior sex offense against a child. In 2013, Salazar pleaded guilty to violating Penal Code former section 288a against Abby N. Abby testified that when she was 13 years old and Salazar was 22 years old they were "lovers" for less than a month. Salazar initiated the sexual contact. They would kiss and touch each other's bodies, and Salazar touched Abby's breasts and vagina over her clothes. Salazar would grab or guide her hand to his penis. But when Abby said she was uncomfortable, he stopped making her touch him. Sometimes she wanted him to stop, but she was scared to tell him. While she was okay with the kissing, she was not okay with the touching.

## III. CSAAS evidence

Dr. Jayme Jones, a clinical psychologist, testified about myths affiliated with children who have suffered sexual abuse. The myths include that an abused child will fight back and will immediately disclose the abuse, fully and consistently. The reality is that abused children rarely tell anybody, and when they do tell, it's years after the abuse occurred. To judge the support of the person they are telling, they disclose a little at a time. It is also untrue that molesters are often strangers. A person is three times as likely to be assaulted by someone they know.

The doctor also testified about CSAAS, which is a model describing the context in which abuse occurs. The model refers to

4

five factors.  The first is secrecy; that is, the abuse occurs in private.  The second factor is helplessness, in that children are often physically helpless and mentally trained to do what adults say.  Third, children try to accommodate—live with—the abuse.  This leads to the fourth factor, delayed disclosure, which can occur months to years after the abuse.  Finally, children recant when faced with the consequences of a disclosure, for example, being put in a foster home or having to testify.

In Dr. Jones's experience, it is common for sexual assault victims not to report the abuse right away and to minimize what they've gone through.  It is also common to forget details, in part because of the way memory works.

The doctor did not interview Isabella or review any matter related to this case.  However, based on hypotheticals modeled on the facts of this case, Dr. Jones testified that the hypotheticals showed a consistent pattern of delayed disclosure.  Also, telling the sister one story and the forensic interviewer another was consistent with CSAAS because the child would want to avoid upsetting the sister, whereas the forensic interviewer would not have a big reaction.

IV.    Verdict and sentence

A jury found Salazar guilty of forcible copulation with a person under the age of 14 (Pen. Code, former § 288a(c)(2)(B);[3] count 1); oral copulation or sexual penetration with a child 10 years or younger (*id.*, § 288.7, subd. (b); count 2); forcible rape of a child under 14 years (*id.*, § 261, subd. (a)(2); count 3); and engaging in sexual intercourse or sodomy with a child 10 years of age or younger (*id.*, § 288.7, subd. (a); count 4). As to counts 1 and 3, the jury found true the allegation that Salazar had a prior conviction of Penal Code former section 288a.

Per the One Strike law (Pen. Code, § 667.61), the trial court sentenced Salazar to life without the possibility of parole (LWOP) on counts 1 and 3. The trial court also imposed but stayed determinate terms on those and the remaining counts. The trial court imposed fines and fees, which we discuss in detail below.

## DISCUSSION

I.    Evidence Code[4] section 1108

Over a defense objection under section 352, the trial court admitted evidence that Salazar had committed a prior sex offense against Abby, finding that the evidence was not remote in time, involved similar conduct, and was not more inflammatory than the charged crime. Salazar now contends that the trial court abused its discretion in admitting the evidence, and that its admission violated his constitutional rights to due process and to a fair trial. We disagree.

---

[3]    Penal Code section 288a has been renumbered as section 287.

[4]    All further undesignated statutory references are to the Evidence Code.

6

Evidence of prior criminal acts is generally inadmissible to prove the defendant's conduct on a specific occasion. (§ 1101, subd. (a).) But where a defendant is charged with a sexual offense, evidence the defendant committed other sexual offenses is admissible to prove the defendant's propensity to commit crimes of a sexual nature if the evidence is not inadmissible under section 352. (§ 1108, subd. (a); see generally *People v. Falsetta* (1999) 21 Cal.4th 903, 911; *People v. Christensen* (2014) 229 Cal.App.4th 781, 795–796.) Accordingly, evidence a defendant committed other sexual offenses should be excluded under section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Otherwise, admissibility of uncharged acts depends on (1) whether the propensity evidence is similar enough to the charged behavior so that it tends to show the defendant committed the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry; and (5) whether admitting the propensity evidence will require an undue consumption of time. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.)

We review a challenge to a trial court's admission of section 1108 evidence for abuse of discretion. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.)

Here, the evidence was strongly probative to show that Salazar had a sexual interest in underage girls. It was also

7

probative to counter Salazar's defense, that he was sexually interested in men.[5] (See, e.g., *People v. Cordova* (2015) 62 Cal.4th 104, 134 [prior crimes evidence relevant to rebut defense theory that defendant's sperm entered victim's body by innocent means].)

Salazar concedes that the prior crime evidence was not remote and did not consume an undue amount of time at trial. Instead, he argues that the evidence was materially different and thus lacked probative value because the prior offense did not involve force. Rather, he describes what happened between Abby and him as "wanted conduct." Not so. Abby testified that she was okay with kissing but not with the touching, in particular touching Salazar's penis. Also, that Salazar did not use the same force against Abby that he used against Isabella does not sufficiently undermine the probative value of the evidence to establish Salazar's interest in underaged girls. Indeed, that Salazar did not use the same level of force against Abby, as well as that Salazar was not a father figure to Abby, made the prior offense *less* inflammatory than the current one and reduced any prejudicial effect. (See, e.g., *People v. Cordova, supra*, 62 Cal.4th at p. 133; *People v. Lewis* (2009) 46 Cal.4th 1255, 1287 [that uncharged offense was "less inflammatory" than charged offenses supported conclusion trial court did not abuse discretion].)

Salazar also argues that the age difference between the victims—Abby was 13 years old while Isabella was nine years old when he first assaulted her—renders the prior offense materially distinct. We disagree that the four year age gap was significant, given that both girls were adolescents who would have been in

---

[5] In his defense, Salazar introduced evidence he had a sexual relationship with a man.

8

elementary or middle school.  We also disagree with Salazar's assertion that there is a significant emotional, physical, and sexual gap between the age groups, and he cites no authority for that assertion.  In any event, courts have found greater age gaps between victims to be immaterial.  (See, e.g., *People v. Daveggio and Michaud*, *supra*, 4 Cal.5th at pp. 825–826 [13-year-old prior victim and 22-year-old current victim]; *People v. Williams* (2016) 1 Cal.5th 1166, 1169, 1174, 1197 [six-year old prior victim and 14-year old current victim].)

Finally, Salazar does not argue that the evidence was likely to confuse or distract the jurors from their main inquiry, and we discern no such likelihood.  Rather, the evidence concerning Abby was relatively brief and distinct from evidence concerning Isabella.

We therefore conclude that the trial court did not abuse its discretion by admitting the prior offense evidence and that Salazar's due process right was not violated.  (See generally *People v. Jandres* (2014) 226 Cal.App.4th 340, 357 [application of ordinary rules of evidence generally doesn't implicate federal Constitution].)

II.     Admissibility of CSAAS evidence

Salazar next contends that Dr. Jones's testimony about CSAAS was irrelevant and that the trial court failed to fulfill its gatekeeper role in determining the admissibility of the evidence. (See generally *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770; *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579.)

The first problem with Salazar's contention is that he never objected to Dr. Jones's testimony under *Sargon* and *Daubert* or otherwise.  He therefore forfeited any issue regarding the

9

admissibility of the evidence.  (§ 353; see *People v. Flinner* (2020) 10 Cal.5th 686, 726 [defendant forfeits argument on appeal where no objection made below].)

Recognizing the forfeiture problem, Salazar argues that his trial counsel provided ineffective assistance by failing to object. (See generally *Strickland v. Washington* (1984) 466 U.S. 668 [claim requires error *and* prejudice].)  Because Salazar raises this claim, we address the merits of his contention about the admissibility of the expert's testimony.

Expert testimony is admissible if it concerns a subject sufficiently beyond common experience, and the expert's opinion would assist the trier of fact.  (§ 801, subd. (a).)  As the expert Dr. Jones testified here, CSAAS is designed for use in therapeutic settings to treat children who have suffered sexual abuse, as it purports to explain why child victims of sexual abuse exhibit certain behaviors.  (See generally *People v. Bowker* (1988) 203 Cal.App.3d 385, 392, fn. 8.)  Our California courts have long held that such evidence is admissible to rehabilitate a complaining witness's "credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation," although expert testimony on the common reactions of child molestation victims is inadmissible to prove that the complaining witness in fact has been sexually abused.  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300; accord, *People v. Lapenias* (2021) 67

Cal.App.5th 162, 171 [collecting cases] (*Lapenias*); *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*).)**6**

This is exactly why the evidence was relevant here:  to explain why Isabella might have delayed telling her family about the abuse and why Isabella did not disclose the extent of the abuse to Preciosa, failings the defense suggested lessened Isabella's credibility.  The CSAAS factors of secrecy, accommodation, and delayed disclosure thus went to explain Isabella's behavior after being sexually assaulted.  (See, e.g., *Lapenias*, *supra*, 67 Cal.App.5th at p. 172 [CSAAS evidence relevant for purpose of assessing victim's behavior]; see also *People v. Brown* (2004) 33 Cal.4th 892, 896, 905–906 [citing CSAAS in finding admissible expert testimony about behavior of domestic violence victims].)

Salazar argues that the trial court should have nonetheless determined the admissibility of CSAAS evidence under *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013 (the *Kelly/Frye* test).  As *Munch*, *supra*, 52 Cal.App.5th at pages 472 to 473, summarized, the *Kelly/Frye* test applies to expert testimony based on a *new* scientific technique.  When such evidence is offered, its proponent must first establish the reliability of the method, meaning its acceptance in the scientific community, and the witness's qualifications.  (*Munch*, at p. 472.) CSAAS evidence, however, is not new evidence but has been

---

**6**    *McAlpin* is binding on this state's lower courts.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) That out-of-state courts may disagree about the admissibility of CSAAS evidence (see, e.g., *State of New Jersey v. J.L.G.* (2018) 234 N.J. 265) does not change its impact on California cases. (*Munch*, *supra*, 52 Cal.App.5th at p. 468.)

found to have been properly admitted by courts in this state for decades. (*Ibid.*) Moreover, the *Kelly/Frye* test does not apply to expert testimony like that given by Dr. Jones here, which concerns an expert's clinical experience with child sexual abuse victims and professional literature on the topic. (*Munch*, at p. 473; accord, *Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) "CSAAS testimony does not purport to provide a definitive truth; rather, the expert testimony attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused." (*Lapenias*, at p. 173.) "Such expert testimony meets 'traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly/Frye*].' " (*Munch*, at p. 473.)

Salazar's remaining contention concerning CSAAS is that the standard instruction on it, CALCRIM No. 1193, improperly bolstered Isabella's credibility. We review such a claim of instructional error under a de novo standard of review. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 175.)

The trial court here instructed the jury with CALCRIM No. 1193, that Dr. Jones's testimony about CSAAS "is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not Isabella M.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his [*sic*] testimony."[7]

Appellate courts have found that CALCRIM No. 1193 "does not: (a) improperly allow an alleged minor victim of sexual abuse

---

[7]     Although Salazar's trial counsel did not object to CALCRIM No. 1193, we address his contention.

to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 175, citing *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504.)  In *Gonzales*, the trial court instructed the jury with CALCRIM No. 1193.  The defendant in that case argued that the instruction asked for an impossibility, telling the jury it could use CSAAS testimony to evaluate the victim's testimony but not as proof the defendant committed the crime.  (*Gonzales*, at p. 503.) The appellate court responded that a "reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused.  The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested.  The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that the [victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested." (*Gonzales*, at p. 504; accord, *Munch*, *supra*, 52 Cal.App.5th at pp. 473–474.)

CALCRIM No. 1193 makes clear that CSAAS evidence is not evidence the defendant committed the crimes.  It is evidence to explain the victim's conduct, which the jury may rely on to evaluate the victim's credibility.  We therefore do not agree that the instruction compels a finding of guilt.

13

III.    Prosecutorial misconduct

Salazar contends the prosecutor committed misconduct during argument.  We discern no misconduct.

A.    *Applicable legal principles*

The federal and state standards governing prosecutorial misconduct are well settled.  " 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.  Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1052; *People v. Wright* (2021) 12 Cal.5th 419, 443–444.)  When a claim of misconduct is based on the prosecutor's arguments before the jury, we consider whether there is a reasonable likelihood the jury construed or applied the challenged remarks in an objectionable fashion.  (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)  We consider the statements in context and view the argument and instructions as a whole. (*Ibid.*)  "We review claims of prosecutorial misconduct under an abuse of discretion standard." (*People v. Dworak* (2021) 11 Cal.5th 881, 910.)

A "claim of prosecutorial misconduct is forfeited when there was neither a timely and specific objection nor a request for admonition." (*People v. Powell* (2018) 6 Cal.5th 136, 182; *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.)  As Salazar acknowledges, his trial counsel did not object to any of the alleged misconduct.  He nonetheless argues that, to the extent forfeiture

14

is at issue, his trial counsel provided ineffective assistance. As we have said, to establish that claim, a defendant must show both that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance resulted in prejudice. (*People v. Bell* (2019) 7 Cal.5th 70, 125.) As we now explain, no misconduct occurred.

> B. *Improper appeals to the passion of the jury*

Salazar's first claim of misconduct concerns the prosecutor's argument that Salazar is a "predator" who "preys on little girls," and the jury's "job is to hold this predator accountable." He argues that this was an improper appeal to the passions of the jury because the jury's job is to evaluate whether the prosecutor met its burden of proof beyond a reasonable doubt, not to hold a defendant accountable. While a prosecutor may not suggest to the jury it should allow emotion to reign over reason and a critical and neutral evaluation of the evidence (see generally *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 788–789), the prosecutor's argument here did not suggest that. Asking a jury to hold the defendant accountable is not tantamount to a request the jury ignore the burden of proof. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 894–895 [prosecutor can tell jurors they are litmus test as to what community will tolerate].) It is not misconduct for a prosecutor to remind the jury that its function is to determine whether the defendant broke any laws. (*Id.* at p. 894.)

Nor was it misconduct for the prosecutor to call Salazar a "predator." "Argument may be vigorous and may include opprobrious epithets reasonably warranted by the evidence." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [calling

15

defendant " 'contract killer,' " " 'snake in the jungle,' " " 'slick,' " a " 'pathological liar,' " and " 'one of the greatest liars in the history of Fresno County' " not misconduct]; accord, *People v. Farnam* (2002) 28 Cal.4th 107, 168 [describing defendant as " 'monstrous,' " " 'cold-blooded,' " vicious, and a " 'predator,' " and calling evidence " 'horrifying' " and " 'more horrifying than your worst nightmare' " not misconduct].)  Abby was 13 years old and Isabella was nine and 10 years old when Salazar sexually assaulted them; hence, there was evidence that Salazar preyed on young girls, i.e., was a predator.

### C. *Arguing facts not in evidence*

A prosecutor commits misconduct by arguing facts not in evidence.  (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.) Salazar argues that the prosecutor committed such misconduct by telling the jury that he ejaculated with Abby.  However, a prosecutor may make a fair comment on the evidence and has wide latitude to draw inferences from the evidence.  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1363.)  That is what the prosecutor did here.  When the prosecutor asked Abby if Salazar ejaculated, Abby answered, "I do remember feeling like it was wet.  I never looked at it.  I just remember wiping it on my pants and told him I don't want to do that."  Abby's testimony raised the reasonable inference that Salazar ejaculated.  No misconduct occurred.

## IV. Sentencing

Salazar argues that the sentences imposed on counts 1 and 3 were unauthorized.  On those counts, the trial court imposed LWOP per the One Strike law *and* imposed but stayed determinate terms on each count per the Three Strikes law (12

years doubled to 24 years on count 1 and 13 years doubled to 26 years on count 3).  Salazar argues that the trial court could sentence him only under one sentencing scheme and therefore the determinate terms imposed under the Three Strikes law should be reversed and stricken.  The People counter that our California Supreme Court held in *People v. Acosta* (2002) 29 Cal.4th 105 that sentencing under both schemes is appropriate.

The People are correct.  *People v. Acosta, supra,* 29 Cal.4th at page 127, noted that the One Strike and the Three Strikes laws have different objectives.  The objective of the One Strike law is to provide life sentences for aggravated sex offenders. (*Ibid.*)  The objective of the Three Strikes law is to provide greater punishment for recidivists.  (*Ibid.*)  Because the two laws serve separate objectives, ignoring one statutory scheme where a defendant meets the criteria of both would defeat one of the Legislature's objectives.  (*Ibid.*)  A defendant may therefore be sentenced under both schemes.[8]

The People, however, further argue that while Salazar could be sentenced under both laws, the appropriate sentence was to double his LWOP terms rather than impose determinate terms.  *People v. Hardy* (1999) 73 Cal.App.4th 1429, 1433 to 1434, held that doubling an LWOP sentence is proper.  Other courts have disagreed with *Hardy*, because the Three Strikes law allows doubling of only a determinate term and the minimum term of an indeterminate term.  (E.g., *People v. Smithson* (2000) 79 Cal.App.4th 480, 503–504; accord, *People v. Mason* (2014) 232 Cal.App.4th 355, 367–368 [Three Strikes law doesn't permit

---

[8]     Although Salazar urges us to follow the dissent in *Acosta*, we are not at liberty to do so.  (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.)

tripling LWOP term]; *People v. Coyle* (2009) 178 Cal.App.4th 209, 219 [same]; see Couzens, et al., Cal. Practice Guide:  California Three Strikes Sentencing (The Rutter Group 2020) ¶ 7:3 [*Smithson* and *Coyle* are better reasoned].)  Those cases reason that since an LWOP sentence is an indeterminate sentence with no minimum term, the Three Strikes Law does not apply.

In the absence of guidance from our California Supreme Court, we agree that the *Smithson* line of cases is more persuasive.  Accordingly, we disagree with Salazar that the sentence is unauthorized, *and* we disagree with the People that the sentence must be modified.  In sum, the trial court correctly sentenced Salazar on counts 1 and 3.

V.      Fines and fees

At the sentencing hearing, the trial court imposed on count 1 a $300 restitution fine, a $40 court operations fee, and a $30 criminal conviction assessment fee.  The trial court imposed the same fines and fees on count 3.  It then ordered Salazar to "pay a sex offender fine of $300 plus penalty assessments."  Salazar assigns several errors to the trial court's imposition of these fines and fees.

First, the trial court erred in imposing separate restitution fines on counts 1 and 3 under Penal Code section 1202.4, subdivision (b).  Rather, as the People concede, the trial court could impose only one fine under that section.  (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483.)  Although the judgment must be so modified, the abstract of judgment need not be modified because it correctly contains only one restitution fine.

Second, the abstract of judgment includes a $300 fine under Penal Code section 1202.45 that the trial court never orally imposed.  The People again concede that the abstract of judgment

18

must be modified because the trial court did not orally impose this fine.[9]

Third, the trial court failed to state at the sentencing hearing the statutory basis for the $300 sex offender fine plus penalty assessments.[10] Penalty assessments attendant to a Penal Code section 290.3 sex offender fine should be specified in the trial court's oral pronouncement and listed in the abstract of judgment, although any correction can be accomplished via modification to the abstract of judgment rather than remand. (*People v. Hamed* (2013) 221 Cal.App.4th 928, 937–941; *People v. Sharret* (2011) 191 Cal.App.4th 859, 864 [trial court may impose penalty assessments by shorthand, leaving it to court clerk to list them in minutes and abstract of judgment].)  The People concede that the abstract of judgment should be modified to reflect the following assessments:  (1)  $300 (Pen. Code, § 1464, subd. (a)(1)), (2)  $60 (*id.*, § 1465.7, subd. (a)(1)), (3)  $90 (Gov. Code, § 70373), (4)  $210 (*id.*, § 76000, subd. (a)(1)), (5)  $60 (*id.*, § 76000.5, subd. (a)(1)), (6)  $30 (*id.*, § 76104.6, subd. (a)(1)), and (7) $30 (*id.*, § 76104.7).

---

[9] Given this concession, we need not decide whether the trial court could have imposed the fine.  (Compare *People v. Montes* (2021) 70 Cal.App.5th 35, 48–49 [parole revocation fine generally improper where defendant sentenced to LWOP]; with *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [parole revocation fine permissible where LWOP sentence includes determinate term].)

[10] The minute order of the sentencing hearing states that the trial court imposed a $300 fine under Penal Code section 290.3, a $60 surcharge, and $870 in penalties and assessments.

## DISPOSITION

The judgment is modified to strike the restitution fine imposed on count 3 under Penal Code section 1202.4, subdivision (b). The clerk of the Superior Court is directed to modify the abstract of judgment to strike the $300 restitution fine under Penal Code section 1202.45 and to list the amounts of and statutory bases for the Penal Code section 290.3 fine and penalty assessments. The clerk of the Superior Court shall forward the modified abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is affirmed as modified.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

20